STATE OF NEBRASKA, APPELLEE, V. WILFRED W. NIELSEN, APPELLANT.

498 N.W.2d 527

Filed April 9, 1993.    No. S-91-1199.

Bradley D. Holtorf, of Sidner, Svoboda, Schilke, Thomsen, Holtorf & Boggy, for appellant.

Wilfred W. Nielsen, pro se.

Don Stenberg, Attorney General, and Barry Waid for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Claiming he had ineffective assistance of counsel at his trial, Wilfred W. Nielsen, who is serving a life prison sentence for the November 19, 1977, shooting death of his father-in-law, Edward Grabbe, prays in this postconviction action (1) that his conviction be set aside and (2) that he be discharged or resentenced or granted a new trial, as may appear appropriate.

On his direct appeal, Nielsen's conviction and sentence for first degree murder were affirmed. See *State v. Nielsen*, 203 Neb. 847, 280 N.W.2d 904 (1979) (*Nielsen I*).

After a thorough review of the record, we agree with the postconviction relief trial judge that Nielsen is entitled to no relief on his postconviction relief motion.

## ASSIGNMENTS OF ERROR

In his assignment of error in this court, Nielsen simply

claims, "The [postconviction] court erred in finding that [Nielsen] received effective assistance of [trial] counsel thereby overruling and dismissing [Nielsen's] motion for post conviction relief."

Nielsen's 46-page, 162-paragraph motion for postconviction relief filed in the district court for Washington County alleges numerous ways in which he claims his trial counsel was ineffective. The Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution guarantee a criminal defendant the right to assistance of counsel. "The United States Supreme Court and this court have held that the term 'assistance of counsel' means *effective* assistance of counsel." *State v. Stewart*, 242 Neb. 712, 719, 496 N.W.2d 524, 528-29 (1993), citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Kern*, 232 Neb. 799, 442 N.W.2d 381 (1989).

In this appeal, Nielsen basically argues that his trial counsel was ineffective in (1) making a deliberate decision to pursue a "non-existing insanity defense," brief for appellant at 8, thus allowing a State's expert psychiatric witness to describe to the jury Nielsen's guilt of first degree murder and in effect admitting Nielsen's guilt, confusing the jury as to the only defense available to Nielsen (lack of intent), and allowing prejudicial excludable evidence to be considered by the jury; (2) failing to object to an insanity instruction when the defense had introduced no evidence of insanity, unnecessarily confusing the jury, to Nielsen's prejudice; (3) failing to fully investigate and present all possible defenses available; (4) failing to move for a continuance of the trial to investigate testimony of certain witnesses; (5) failing to object to the introduction of certain evidence; (6) failing to properly prepare for trial; and (7) failing to request a manslaughter instruction.

In a pro se brief, Nielsen asserts that the postconviction relief court erred in failing to find that Nielsen's trial counsel had labored under a conflict of interest and therefore had provided Nielsen with ineffective assistance of counsel. Nielsen's trial counsel testified at the postconviction hearing that he had no conflict of interest with Nielsen. Inherent in the postconviction court's holding is a finding that Nielsen had failed to prove that

his trial counsel had a conflict of interest with his client. Even Nielsen testified at his postconviction hearing that his conflict of interest claim was unproven. This assigned error needs no further discussion.

We have fully reviewed other ways not mentioned in the preceding two paragraphs that Nielsen argues that his trial counsel was deficient and find that Nielsen's arguments are without merit and do not require discussion. Neither Nielsen's argument nor his showing demonstrates a reasonable probability that, but for trial counsel's deficient performance, the result of Nielsen's trial would have been different. See *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992).

## STANDARD OF REVIEW

A criminal defendant seeking postconviction relief has the burden of establishing a basis for such relief, and the findings of the district court will not be disturbed unless clearly erroneous. *State v. Lyman, supra*; *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992); *State v. Russell*, 239 Neb. 979, 479 N.W.2d 798 (1992).

In an evidentiary hearing at a bench trial provided by Neb. Rev. Stat. § 29-3001 et seq. (Reissue 1989 & Cum. Supp. 1992) for postconviction relief, the postconviction trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and weight to be given a witness' testimony. See, *State v. Carter, supra*; *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992); *State v. White*, 238 Neb. 840, 472 N.W.2d 720 (1991).

When a defendant in a postconviction motion alleges a violation of his constitutional right to effective assistance of counsel as a basis for relief, the standard for determining the propriety of the claim is whether the attorney, in representing the accused, performed at least as well as a lawyer with ordinary training and skill in the criminal law in the area. Further, the defendant must make a showing of how the defendant was prejudiced in the defense of his case as a result of his attorney's actions or inactions. *State v. Lyman, supra*; *State v. Carter, supra*; *State v. Sanders*, 241 Neb. 687, 490 N.W.2d 211 (1992).

To sustain a claim of ineffective assistance of counsel as a

violation of the Sixth Amendment to the U.S. Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, a demonstration of reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See, *State v. Lyman, supra*; *State v. Sanders, supra*; *State v. Carter, supra*; *State v. Moss, supra*.

## FACTS

Although this case has been the subject of a direct appeal, see *Nielsen I*, we recount those facts relevant to Nielsen's motion for postconviction relief. The evidence at Nielsen's trial, including his statements to officers and his own testimony, reflects the following:

On the morning of November 19, 1977, Nielsen, a professional hunter and owner of a commercial hunting club near Mondamin, Iowa, left his home in Blair, Nebraska, to hunt with club members. The group hunted until about 11 a.m. Nielsen testified that he was upset because his wife had refused to have sexual relations with him the previous night. He said he was further bothered by the fact that it was a bad hunting day.

An admitted alcoholic, Nielsen had not had an alcoholic drink since beginning alcohol treatment July 28, 1977. Nielsen related that after the hunt on November 19, he began thinking about drinking a beer. Fighting his urge to drink alcoholic beverages, Nielsen bypassed bars in Mondamin and Magnolia, Iowa. He did stop at a bar in Logan, Iowa, to buy a sandwich. He said that while he was in the bar, he had at least four or five cans of beer.

Upon leaving the Logan bar, Nielsen said, he drove back to Blair, where he stopped at another bar at approximately 12:30 p.m. Nielsen said he had another seven or eight beers, purchased two cans of beer to take with him, and left that bar around 3 p.m. He drove to a local service station, bought gasoline, and returned to his home.

Once at home, Nielsen said, he sat down and began drinking the beer he had taken home with him. He said his wife was very

upset to see him drinking. When she tried to discuss his drinking of alcoholic beverages with him, he shoved her onto a couch. Nielsen said he then went to a liquor store and purchased a half pint of cold whiskey. Upon returning home, Nielsen found his wife and infant daughter gone. Nielsen then drove to Tekamah to see if his wife was at her sister's home. Nielsen said he took backroads to avoid being picked up for drunk driving. He said he had two half pints of whiskey with him and admitted drinking en route to Tekamah.

Nielsen testified he did not recall the trip to Tekamah. His next recollection was sitting in the driveway of Edward and Opal Grabbes' farm near Spiker, Nebraska. The Grabbes were Nielsen's parents-in-law.

Nielsen entered the Grabbe home carrying a loaded automatic rifle. When fully loaded, the weapon held five bullets, one in the chamber and four in the magazine. Present in the Grabbe home were Edward and Opal Grabbe and their 21-year-old son, Rick. Rick Grabbe testified that a commotion in the Grabbe kitchen first drew his attention to Nielsen's being in the home. Rick's father went into the kitchen. While Edward Grabbe and Nielsen were in the kitchen, Rick saw Nielsen point his gun and fire it toward the floor. After Nielsen fired the shot, he said to Edward Grabbe, "See, it works." Nielsen called Edward Grabbe "a dirty god-damned son-of-a-bitch." Apparently, at some point, Nielsen laid his gun down temporarily and told Edward Grabbe, "*See, you've got me to back down and lay my gun down.*" The evidence reflects that Nielsen fired a second shot in the kitchen.

Rick Grabbe testified that after the second shot, his mother became hysterical and his father was concerned as to whether he should call a doctor. Nielsen, in a "command-type voice," then told Edward Grabbe, "Let's go outside." The elder Grabbe was dressed in work clothes and requested permission to put on his coveralls. Nielsen responded, "*You won't be needing them.*" After this exchange, Rick Grabbe ran upstairs to his bedroom. While examining his pistol to see if it was loaded, Rick heard a shot. His mother shouted, "Ricky, he shot Dad." Rick went out his bedroom window and onto a porch roof. As he was going out onto the roof, he heard another shot. He jumped from the

roof and hid under the porch until he heard Nielsen drive off. Then he went to check on his parents. Both appeared to be dead outside. Nielsen was subsequently charged with first degree murder in the death of Edward Grabbe and also with first degree murder as a result of the death of Opal Grabbe. After his trial for the murder of Edward Grabbe, Nielsen pled no contest to second degree murder for the killing of Opal Grabbe, for which he received a concurrent life sentence. When he entered his no contest plea, Nielsen specifically admitted, in response to a question from the judge, that he purposely and maliciously killed Opal Grabbe.

Before trial, Nielsen's counsel considered a possible insanity defense in regard to Edward Grabbe's death. He had Nielsen examined by four psychiatrists to determine whether Nielsen was legally sane under the *M'Naghten* rule at the time of the killing and whether Nielsen was competent to participate in his own defense. To be found sane under the *M'Naghten* rule, a defendant must have (1) the capacity to understand the nature of the act alleged to be criminal and (2) the ability to distinguish between right and wrong with respect to such act. See *State v. Lesiak*, 234 Neb. 163, 449 N.W.2d 550 (1989).

All four psychiatrists concluded that Nielsen was sane under the *M'Naghten* rule at the time he killed his father-in-law. Nevertheless, Nielsen's counsel filed a notice of intent to rely on an insanity defense pursuant to Neb. Rev. Stat. § 29-2203 (Cum. Supp. 1976). The State then requested and was granted a court order to have Nielsen examined by the State's psychiatrist, Dr. William Bruns. Dr. Bruns, too, concluded in his report that Nielsen was legally sane at the time of Edward Grabbe's killing. He also detailed Nielsen's history of alcoholism and Nielsen's intoxication at the time he shot Grabbe.

At trial, the defense did not offer evidence of insanity on the part of Nielsen. However, the State introduced in its case in chief evidence of Nielsen's state of mind at the time Edward Grabbe was killed. At the time of Nielsen's trial, the State had the burden of proving beyond a reasonable doubt that Nielsen was not insane under the *M'Naghten* rule at the time he killed Edward Grabbe. See *State v. Russell*, 194 Neb. 64, 230 N.W.2d

196 (1975). Dr. Bruns testified in narrative form about the events of the day of the killing as related to him by Nielsen, and Dr. Bruns' written report was received into evidence, both without objection. Defense counsel had not sought to have either Dr. Bruns' testimony or his report suppressed prior to or at Nielsen's trial.

On cross-examination of Dr. Bruns, defense counsel was successful in obtaining corroboration of Nielsen's contention that he was intoxicated at the time Edward Grabbe was killed. Defense counsel was also able to elicit testimony from Dr. Bruns on the effects of chronic alcoholism generally, and its effects on Nielsen in particular. However, the jury convicted Nielsen of first degree murder in the death of Edward Grabbe. Nielsen was sentenced to life imprisonment.

In his postconviction motion, Nielsen claims that his trial counsel was deficient in making a deliberate decision to pursue a "non-existing insanity defense." Nielsen contends this decision allowed Dr. Bruns to describe to the jury Nielsen's guilt of first degree murder, thus in effect admitting Nielsen's guilt, confusing the jury as to the only defense available to Nielsen (lack of intent), and allowing prejudicial excludable evidence to be considered by the jury. At the postconviction hearing, Nielsen's trial counsel testified that notice of the insanity defense was a *trial strategy* to have a witness called by the State corroborate Nielsen's claim that Nielsen was intoxicated at the time he killed Grabbe and therefore could not form the requisite intent to commit first degree murder. Trial counsel further testified that before his trial, Nielsen had agreed with this strategy.

The district judge who presided at the postconviction evidentiary hearing, personally attended by Nielsen with his court-appointed counsel, found that Nielsen's

> [trial] counsel's performance was not deficient and, even if it was deficient, in whole or in part, there is no demonstration of a reasonable probability that but for [trial] counsel's deficient performance the result of the proceedings would have been any different.
>
> [Nielsen] was given a life sentence upon conviction and not the death penalty. While trial counsel was unable to

secure conviction for a lessor [sic] offense, he was able to spare his client from the death penalty. He did so with two witnesses; one was a defense witness ([Nielsen]) and the other was a State's witness (Dr. [William] Bruns.)

The postconviction court further found:

> At the time of sentencing the trial court found that [Nielsen's] "capacity to appreciate the wrongfullness [sic] of his conduct or to conform his conduct to the requirement of the law was impaired as a result of intoxication" and that "had he not been intoxicated, he might have thought long enough before shooting to realize he should not follow through with the impulsive act." The [trial] [c]ourt noted in this regard that this "was taken right out of the doctor's report." Based on the trial court's findings at sentencing, the doctor's testimony was pivotable [sic].

The postconviction judge also found that Nielsen "has failed to show that [trial] counsel's performance was deficient and that he was prejudiced" and overruled Nielsen's postconviction relief motion.

## INEFFECTIVE ASSISTANCE
## OF COUNSEL STANDARD

Nielsen urges that his trial counsel's performance was deficient under the standard enunciated by the U.S. Supreme Court in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Under *Cronic*, the Sixth Amendment guarantee of "[t]he right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. at 656.

The *Cronic* Court noted that counsel is presumed competent, but delineated three circumstances which are inherently prejudicial to the accused and under which ineffective assistance of counsel is presumed. First is when the accused is completely denied counsel at any critical stage of the proceedings. Second is the failure of counsel to subject the prosecution's case to meaningful adversarial testing. *Id.* (citing *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347

(1974) (petitioner denied right of effective cross-examination)). Third, surrounding circumstances may justify a presumption of ineffectiveness without inquiry into counsel's actual performance at trial. *Id.* (citing *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932) (counsel appointed within a few days of trial to defend several young, ignorant, illiterate defendants charged with a capital offense which had been highly publicized and which had aroused horror and hostility in the community)).

The record does not support a claim that the performance of Nielsen's counsel justifies the presumption of ineffectiveness as contemplated by *Cronic*. Nor can it be said that Nielsen's counsel failed to subject the State's case to meaningful adversarial testing or that the surrounding circumstances justify an inference of prejudice.

Upon the facts hereafter stated, we find that Nielsen's trial counsel's performance should not be presumed ineffective and prejudicial under *Cronic*. We will consider defense counsel's performance under the standard announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the companion case to *Cronic*. Under *Strickland*, a defendant must show that his trial counsel's performance was deficient and that the deficient performance prejudiced the defendant's defense in such a way that the defendant was denied a fair trial, that is, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

## INSANITY PLEA

Much of Nielsen's ineffective assistance of counsel claim attacks the decision to enter a plea of insanity 12 days before trial. Nielsen contends that there was no expert evidence that Nielsen was insane at the time of killing Edward Grabbe. Nielsen complains that by his counsel's filing a notice of intent to rely on an insanity defense, Nielsen in effect admitted all elements of the crime, thus relieving the State of its duty to prove all elements of first degree murder beyond a reasonable doubt. Additionally, Nielsen claims the State was then allowed to have Nielsen examined by a psychiatrist. Nielsen contends

that the psychiatrist's testimony included highly prejudicial and excludable evidence which would not otherwise have been placed before the jury.

Nielsen's trial counsel testified at the postconviction hearing that since Nielsen had admitted shooting Edward Grabbe, and in view of Rick Grabbe's testimony, Nielsen's only available defense was that due to his intoxication Nielsen was unable to form the requisite intent or premeditation required to convict him of first degree murder. Trial counsel testified that he thought it was to Nielsen's advantage to have corroborating testimony of Nielsen's intoxication come from an expert witness called by the State rather than from an expert paid by Nielsen. He reasoned that if the State's expert testified to Nielsen's intoxication, it would be difficult for the State to argue that Nielsen was not intoxicated. Trial counsel testified that there was no other witness to testify that Nielsen *was* intoxicated prior to, or at the time of, the shootings. In fact, Nielsen's counsel knew that the State would call numerous witnesses to testify that Nielsen *was not* intoxicated on the afternoon of November 19.

Nielsen's trial counsel testified that he informed his client of the proposed trial strategy and, with Nielsen's consent, trial counsel filed an insanity plea. At the time, Nielsen was told by his trial counsel that he would be examined by a psychiatrist selected by the State and that any statement he made to the State's psychiatrist could be used in court. This admonition was repeated by the psychiatrist before he examined Nielsen. At trial, as defense counsel predicted, the psychiatrist, based upon what Nielsen told him, did corroborate Nielsen's testimony that Nielsen was intoxicated at the time he shot and killed Grabbe.

By its verdict, it is obvious that the jury found beyond a reasonable doubt that Nielsen, at the time of shooting Edward Grabbe, had the capacity to, and did indeed, form the requisite intent to kill Grabbe, and that he did so with deliberate and premeditated malice. It is also obvious that the jury did not believe that Nielsen was intoxicated at the time of Grabbe's death, or that if he was intoxicated, the degree of Nielsen's intoxication did not prevent him from forming the intent to kill Grabbe or from killing Grabbe with deliberate and

premeditated malice.

A defendant cannot elect a particular trial strategy and then complain if it proves unsuccessful. *State v. Evans*, 218 Neb. 849, 359 N.W.2d 790 (1984); *State v. Harper*, 218 Neb. 870, 359 N.W.2d 806 (1984). The fact that a trial strategy adopted by defense counsel (and the defendant) proves to be unsuccessful in that the defendant is convicted does not alone sustain a finding of ineffectiveness of counsel. *State v. Keithley*, 236 Neb. 631, 463 N.W.2d 329 (1990). *Nielsen himself agreed at his postconviction hearing that his trial counsel was ineffective only to the extent that he was unable to convince 12 jurors that Nielsen did not intend to pull the trigger when he shot and killed Edward Grabbe.* The fact that trial counsel's strategy of using the State's expert witness to corroborate Nielsen's claimed lack of intent caused by his alleged intoxication was unsuccessful in convincing the jury that Nielsen was not guilty of first degree murder does not support a claim of ineffectiveness of counsel. As trial counsel testified, lack of intent due to intoxication was the only defense Nielsen had.

Assuming, but not deciding, that some of the testimony of the State's psychiatrist was excludable as Nielsen contends, he cannot complain about it after the fact. A defendant cannot complain of error which the defendant invited the court to commit. See *State v. Red Kettle*, 239 Neb. 317, 476 N.W.2d 220 (1991); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377 (1991). The postconviction record reflects that Nielsen not only agreed with his trial counsel's strategy to use the State's expert to corroborate Nielsen's claim of intoxication at the time of his crime, but he took an active part in executing that strategy. By doing so, Nielsen participated in inviting any error in the admission of the testimony of the State's psychiatrist. Although Nielsen testified at his postconviction hearing that in hindsight, he would have liked to not have trial counsel file a notice of insanity, the ineffectiveness of counsel will not be judged by hindsight. See *State v. Wickline*, 241 Neb. 488, 488 N.W.2d 581 (1992).

This court has held that in determining whether a trial counsel's performance was deficient, there is a strong presumption that such counsel acted reasonably. See *State v.*

*Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992). The two prongs of the *Strickland* test do not necessarily have to be addressed in order. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Strickland, supra.* See, also, *State v. Reichert*, 242 Neb. 33, 492 N.W.2d 874 (1992); *State v. Wickline, supra; State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992).

It is undisputed that Nielsen shot and killed Edward Grabbe. Nielsen himself admitted shooting Grabbe, and his brother-in-law witnessed all the events prior and up to the actual shooting. The principal issue at trial was whether Nielsen's alleged intoxication rendered him incapable of forming the intent or having the deliberate and premeditated malice necessary to convict him of first degree murder.

Nielsen contends that he was prejudiced when the State's expert psychiatric witness, Dr. Bruns, testified without objection that Nielsen had stated that "he aimed his gun and fired it" at Edward Grabbe and when Dr. Bruns' written report containing this statement was subsequently allowed to go to the jury. Nielsen argues that Dr. Bruns' testimony provided the only evidence of deliberate and premeditated malice and of intent, elements which were necessary under Nebraska law to convict Nielsen of first degree murder. We disagree. The record is replete with evidence proving these elements. Nielsen himself testified that he was upset with his wife the day he went to his in-laws' home. There was testimony by Nielsen and other witnesses that the relationship between Nielsen and his in-laws had not been good for a variety of reasons, among which was Nielsen's drinking. Even without Dr. Bruns' testimony, deliberate and premeditated malice, as well as intent, could be inferred beyond a reasonable doubt by the jury from other evidence of Nielsen's actions and statements on the day of the killing.

Malice may be inferred from the shooting of another person with a deadly weapon. *State v. Worley*, 178 Neb. 232, 132 N.W.2d 764 (1965). "Malice" is the intentional doing of a wrongful act without just cause or excuse. *State v. Batiste*, 231 Neb. 481, 437 N.W.2d 125 (1989). Nielsen was a commercial hunter who was familiar with guns and the applicable safety

rules. Obviously the safety on his loaded automatic rifle was not engaged as Nielsen stood in the kitchen of the Grabbe home, because the gun was fired. Nielsen testified that the shot was accidental, although Rick Grabbe's testimony indicates otherwise. From the facts, a jury could conclude beyond a reasonable doubt that Nielsen was put on notice that the safety on his rifle was not engaged, and that he either did not engage the safety because he still intended to use the weapon or that he did engage the safety and disengaged it to shoot and kill Edward Grabbe. Given Nielsen's familiarity with guns, and the ease with which an accidental firing could have been prevented, the fact that Nielsen did nothing to prevent further "accidental" firings and eventually shot his father-in-law and, after an interval of time, shot his mother-in-law with a deadly weapon is further evidence from which the jury could conclude beyond a reasonable doubt that Nielsen did intend to kill Edward Grabbe with deliberate and premeditated malice.

The location, nature, and number of wounds inflicted are circumstances from which a jury may draw the inference that a killing is done with deliberate and premeditated malice. *State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983). Nielsen was admittedly a "fairly good shot" and killed Grabbe with a single bullet to the head and then killed Opal Grabbe. These are circumstances which would permit a jury to infer beyond a reasonable doubt that Nielsen intentionally killed Grabbe with deliberate and premeditated malice. There is no evidence that either Edward Grabbe or his wife was armed when they were shot.

Malice may be inferred from words passing between defendant and victim. See, *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991); *State v. Bautista*, 193 Neb. 476, 227 N.W.2d 835 (1975). Rick Grabbe testified at trial that he saw Nielsen *point his rifle toward the kitchen floor and fire it*, after which Nielsen stated, "See, it works." He heard Nielsen call Edward Grabbe "a dirty god-damned son-of-a-bitch." Apparently, at some point, Nielsen temporarily laid his gun down and told Grabbe, "*See, you've got me to back down and lay my gun down.*" Nielsen, "in a command-type voice," told his father-in-law, "Let's go outside." When the elder Grabbe

requested permission to put on his coveralls, Nielsen responded, "*You won't be needing them.*"

In contrast to Rick Grabbe's clear testimony regarding events on the day of the killing, Nielsen testified that his memory of the day's events was "vague." He frequently answered questions both on direct and cross-examination by saying he did not "recall" or did not "remember." Nielsen's testimony in his own defense, and particularly as to what occurred as he and Grabbe walked outside, was often contradictory. For example, Nielsen testified on direct examination that he was the first to start down the steps outside the back of Grabbe's house. On cross-examination, Nielsen testified that it was possible that Grabbe started down the steps first.

Nielsen's testimony at his postconviction hearing, at which time he claimed that his memory was much improved, was inconsistent with his trial testimony. Nielsen testified at his trial that Grabbe pushed or shoved into him as they went out the door, that Nielsen began to fall on the steps, and that as Nielsen turned, his rifle fired accidentally. At his postconviction hearing, Nielsen stated that he clearly remembers that it was Grabbe who walked out of the house first. There was evidence that Nielsen said that Grabbe grabbed for Nielsen's gun and that the two struggled. At the postconviction hearing, Nielsen claimed that there was no struggle over the gun. Instead, Nielsen claimed that he stumbled while walking out and unintentionally shot Grabbe when Grabbe reached to steady him.

None of this, of course, explains why Nielsen would have then proceeded to shoot and kill Opal Grabbe. Nielsen claimed at trial that he could not remember killing his mother-in-law after he killed her husband. At Nielsen's trial, evidence of the killing of Opal Grabbe was admitted for the limited purpose of showing the intent or motive of Nielsen in killing Edward Grabbe, and the jury was so instructed. Nielsen's killing of Opal Grabbe was further evidence from which the jury could have inferred beyond a reasonable doubt that Nielsen intentionally shot Edward Grabbe.

Finally, while at his postconviction hearing Nielsen continued to deny "aiming" the weapon at Grabbe, he

nevertheless admitted that he was intentionally "pointing" the loaded rifle at Grabbe. The difference between "aiming" and intentionally "pointing" a loaded rifle is insignificant in determining intent under the circumstances of this case. Nielsen's own postconviction testimony makes it clear that he was not prejudiced by Dr. Bruns' testimony that Nielsen "aimed" his rifle at Grabbe.

In *State v. Coleman*, 239 Neb. 800, 814-15, 478 N.W.2d 349, 358 (1992), this court held:

> In the trial of a criminal case, erroneous admission of evidence which is not cumulative may constitute harmless error beyond a reasonable doubt, when a defendant's conviction is supported by overwhelming evidence which has been properly admitted or admitted without objection. . . . In contrast with the preceding, we have expressed the "harmless error" standard pertaining to erroneous admission of cumulative evidence: "Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted, or admitted without objection, supports the finding by the trier of fact."

Even if Dr. Bruns' testimony that Nielsen said he "aimed his gun and fired it" at Grabbe was inadmissible to show deliberate and premeditated malice or intent and was improperly admitted into evidence through ineffectiveness of trial counsel, there was other, properly admitted, overwhelming direct and circumstantial evidence of Nielsen's intent and his deliberate and premeditated malice to support his conviction. The admission of Dr. Bruns' testimony to which Nielsen objects was harmless error beyond a reasonable doubt. Therefore, Nielsen has failed to demonstrate a reasonable probability that, but for the admission of the testimony of the State's expert psychiatric witness, the outcome of his trial would have been different.

## INSANITY INSTRUCTION

Nielsen also claims that his trial counsel was ineffective for failing to object to an insanity instruction given by the trial court when the defense had introduced no evidence of insanity

and that the instruction was unnecessarily confusing to the jury, to his prejudice. Nielsen cites *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984), in support of this claim.

In *Vosler*, the defendant pled not guilty to a charge of first degree murder but did not file a written notice of intention to plead not responsible by reason of insanity. At trial, the defendant introduced two expert witnesses who testified as to the defendant's inability to form the requisite intent for first degree murder. The State then introduced the testimony of its own expert witness on the element of intent.

The court instructed the jury that one option was to find the defendant not responsible by reason of insanity. The court further instructed the jury that intent was an element of both first and second degree murder. The defendant objected to the giving of the insanity instruction, which objection was overruled.

The defendant was convicted of second degree murder, and on appeal assigned as one error the giving of the insanity instruction. He argued that insanity was never an issue in his case and that his expert testimony was directed only toward showing that his act of killing was not one of premeditated malice. This court reversed Vosler's conviction, stating:

> Defendant correctly argues that any instruction concerning an *unpled and unproved* insanity defense is likely to confuse a jury as to the proper role the evidence concerning the defendant's mental condition is to play in its determinations. The insanity defense instruction should not have been given.

(Emphasis supplied.) *Vosler*, 216 Neb. at 469, 345 N.W.2d at 811.

Nielsen's case is distinguishable from *Vosler*. Nielsen's insanity defense was not unpled. To the contrary, Nielsen raised the issue of his insanity prior to trial in accordance with the requirements of § 29-2203 (Cum. Supp. 1976), the statute then in effect. Although all defendants are presumed sane, the law at the time of Nielsen's trial was that if *any evidence* tending to show a defendant's insanity was adduced by either the defendant or the State, the State had the burden of convincing the jury beyond a reasonable doubt of the defendant's sanity as

one of the elements necessary to establish guilt. See *Thompson v. State*, 159 Neb. 685, 68 N.W.2d 267 (1955).

In a criminal trial, the court in its instructions must delineate for the jury each material element the State is required to prove beyond a reasonable doubt to convict the defendant of the crime charged. *State v. Gorman*, 232 Neb. 738, 441 N.W.2d 896 (1989). Therefore, the question before this court is whether there was any evidence adduced by either Nielsen or the State tending to show that Nielsen was insane at the time he killed Grabbe, so as to justify the giving of an insanity instruction.

Dr. Bruns, an expert witness called by the State, testified that Nielsen was able to understand and appreciate the nature and quality of his actions and that Nielsen knew right from wrong. Thus, according to Dr. Bruns' testimony, Nielsen was legally sane. However, the law is settled that the trier of fact is not obligated to take the opinion of an expert as binding upon it. See, *State v. Cook*, 236 Neb. 636, 463 N.W.2d 573 (1990); *State v. Phinney*, 236 Neb. 76, 459 N.W.2d 200 (1990).

There was other evidence adduced at trial from which a jury might have concluded that Nielsen was legally insane. The report of a neurologist which was entered into evidence by the State indicated that Nielsen at one time had been kicked in the head and had been unconscious. He had a history of blackouts when he was intoxicated. Nielsen's history also included ingestion of Sominex in the summer of 1977 and during the 2 weeks prior to Edward Grabbe's killing. The report further noted in regard to the side effects of scopolamine, an ingredient of Sominex:

> The patient may be restless, excited, confused and exhibits weakness, giddiness and muscular incoordination. The behavior and mental symptoms may suggest an *acute organic psychosis. Memory is disturbed*. Orientation is faulty. Hallucinations (especially visual) are common. The sensorium is clouded, and mania and delirium are not uncommon. The diagnosis of an acute schizophrenic episode or alcoholic delirium has mistakenly been made in some patients.

(Emphasis supplied.)

Nielsen testified of memory lapses the afternoon of Edward

Grabbe's killing. He could not recall the details of driving to his sister-in-law's house in Tekamah or driving to the Grabbe farm. He did not remember killing Opal Grabbe. His recollection of other events that day was "hazy," and his thinking was "upset."

Additionally, Dr. Bruns' report which was received into evidence reported Nielsen as saying that he felt like "passing out" inside the Grabbe house. That report also stated that Nielsen said that when Nielsen's gun discharged, killing Edward Grabbe, it was "like total pitch black" and that Nielsen had no further recollection of events until he found himself "on the other side of the river" in his pickup truck.

Presented with the above evidence, a jury could logically conclude, although Nielsen's jury obviously did not, that Nielsen was suffering from an earlier head injury, from an alcoholic blackout, or from a drug-induced psychosis at the time he killed Edward Grabbe, and that the State had failed to prove Nielsen's sanity beyond a reasonable doubt. There being evidence to support an insanity instruction, it was not error to so instruct the jury, and Nielsen was not prejudiced by trial counsel's failure to object to such an instruction.

### INVESTIGATION OF POSSIBLE DEFENSES

Next, Nielsen claims that his trial counsel failed to fully investigate and present all possible defenses of law and fact in a proper and timely manner. Examined more closely, Nielsen's argument is really complaining that counsel did not obtain expert witnesses to (1) construct alternate theories of how the shooting of Grabbe could have occurred and (2) testify as to the effect of Nielsen's alcoholism. Nielsen believes such witnesses could have provided testimony to negate the element of intent.

Specifically, Nielsen alleges that a firearms expert or a pathologist could have conducted examinations or tests to disprove the State's allegation that Nielsen raised his rifle to his shoulder, aimed it, and fired it at Grabbe, particularly in regard to the distance of the gun from the entrance wound and the angle of the gun in relation to the path of the fatal bullet through Grabbe. However, in a letter entered into evidence by Nielsen at his postconviction hearing, pathologist Dr. Vincent Dimaio stated that he was unable to contradict the conclusions

of Dr. Jerry Jones, the State's pathologist who performed an autopsy upon Grabbe's body and who testified at Nielsen's trial. Dr. Dimaio further stated that to determine the exact distance from which a gun will produce characteristic marks at an entrance wound, it is necessary to test the weapon in question. That could not be done in this case because Nielsen disposed of the murder weapon in the Missouri River on the way home after killing the Grabbes. The gun has never been recovered.

Dr. Jones testified at the postconviction hearing that it is difficult to accurately determine the trajectory of a bullet in a head wound because of the mobility of the head. Dr. Dimaio's letter was in agreement with Dr. Jones' testimony.

Nielsen's trial counsel testified at the postconviction hearing that he did not hire pathology or firearms experts on Nielsen's behalf because in his opinion, they would not have benefited Nielsen. Nielsen has presented no evidence that such expert testimony would in any way negate an intentional shooting of Grabbe. Based upon the available facts, neither pathologist would speculate as to how Grabbe's gunshot wound occurred.

Nielsen also argues that trial counsel should have obtained an expert witness to testify as to the effects of Nielsen's alcoholism. The record shows that Dr. Bruns testified extensively as to Nielsen's intoxication and the effect that such intoxication could have had on Nielsen's ability to deliberate on his actions and their consequences. As previously stated, Nielsen's trial counsel, with the agreement of Nielsen, deliberately used the State's witness to show Nielsen's intoxication because he believed such testimony would be more effective than the testimony of a paid defense witness. Although Nielsen entered the deposition of an alcohol counselor into evidence at his postconviction hearing, he has failed to show that such an expert could have testified to anything more than Dr. Bruns did at trial.

A defense attorney's duty is to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *State v. Ryan*, 233 Neb. 151, 444 N.W.2d 656 (1989); *State v. Painter*, 229 Neb. 278, 426 N.W.2d 513 (1988). A strategic decision to call, or not to call, particular witnesses will not, without more, sustain a finding of

ineffectiveness of counsel. See, *State v. Jones*, 241 Neb. 740, 491 N.W.2d 30 (1992); *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991). The court will not second-guess reasonable strategic decisions made by defense counsel. *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992).

Nielsen has made no showing that any expert witnesses would have been of benefit to his defense, and he therefore suffered no prejudice by his counsel's decision not to call such experts. Defense counsel's decisions in this regard appear to be reasonable under the circumstances and do not support a claim of ineffectiveness.

## FAILURE TO OBTAIN CONTINUANCE

Nielsen claims that his trial counsel was deficient in failing to request a continuance or postponement of his trial due to the State's late endorsement of three witnesses. In Nielsen's direct appeal, he alleged that the trial court erred in permitting the late endorsement of these witnesses. See *Nielsen I.* Although Nielsen correctly states that this court took note of the fact that there had been no motion for continuance, he ignores the court's holding that he was not prejudiced by the testimony of any of these three witnesses. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased. *State v. Otey*, 236 Neb. 915, 464 N.W.2d 352 (1991), *cert. denied* _____ U.S _____, 111 S. Ct. 2279, 115 L. Ed. 2d 965. We abide by our previous holding and decline to reexamine the issue.

## FAILURE TO OBJECT TO EVIDENCE

Nielsen asserts that certain statements he made to law enforcement officials while in the Washington County jail were made involuntarily and therefore suppressible. He claims that trial counsel was ineffective for failing to file motions to suppress such statements and for failing to object to the admission of the statements into evidence. The record shows that Nielsen asked why he was being arrested and whom he had killed when he was arrested on the day of the killings. On the day following his arrest, Nielsen told the sheriff that he did not remember shooting "the woman" but would show the sheriff

where he had thrown the gun. The weapon was never found. Later that same day, Nielsen went with the sheriff, a State Patrol investigator, his own attorney, and the county attorney to the site where he had thrown the gun into the river. Still later that day, Nielsen requested to call his wife and told the sheriff that he wanted to tell her "[he] didn't mean to." On December 21 Nielsen told a deputy sheriff, "The first one was an accident. I don't remember shooting the woman."

Nielsen maintains that these statements were coerced from him in response to his requests to use the telephone. However, the sheriff testified at Nielsen's postconviction hearing that Nielsen's statements were voluntary, having been initiated by Nielsen himself. By denying Nielsen postconviction relief, the postconviction hearing judge resolved this factual dispute against Nielsen and was not clearly wrong in so doing.

The failure of counsel to investigate or move to suppress a questionable confession is not per se ineffective assistance of counsel if it can be shown from the record that the evidence is so overwhelming against the defendant that failure to investigate or suppress the confession was a reasonable strategic move by counsel or that the defendant suffered no prejudice from counsel's inaction. *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992).

None of Nielsen's pretrial statements were necessary for his conviction, and some were cumulative to his testimony at trial. If we assume that any of Nielsen's statements to the sheriff and a deputy sheriff constituted a confession, and if we further assume that such statements were inadmissible, the error in receiving the statements was harmless beyond a reasonable doubt because, as previously noted, the other evidence produced by the State overwhelmingly established the defendant's guilt of the charges of which he was convicted. See, *State v. Navrkal*, 242 Neb. 861, 496 N.W.2d 532 (1993); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Cox*, 231 Neb. 495, 437 N.W.2d 134 (1989); *State v. Greeno*, 230 Neb. 568, 432 N.W.2d 547 (1988). Nielsen has failed in his burden to show that his trial counsel's inaction prejudiced his defense in such a way as to change the outcome of his trial.

## FAILURE TO PROPERLY PREPARE FOR TRIAL

Nielsen contends that his trial counsel failed to properly prepare for trial because he met with Nielsen only once before trial, and that was on the eve of the trial itself. Other evidence of counsel's failure to prepare for trial cited by Nielsen includes a failure to object to certain exhibits and failure to cross-examine Dr. Bruns until 2 days after the State's direct examination of that witness.

The record does not support Nielsen's claim that trial counsel met only on the eve of trial with Nielsen. Nielsen's trial counsel testified at the postconviction hearing that he initially interviewed Nielsen at the Washington County jail 2 or 3 days after Nielsen was arrested. Although he had no idea of the total number of times he interviewed Nielsen, he stated he had "frequent interviews" with Nielsen during trial preparation. For a time, Nielsen was held in the Sarpy County jail. The Sarpy County jail telephone log entered into evidence showed numerous phone calls from Nielsen to trial counsel's law firm. The individual who was a Sarpy County deputy sheriff at the time Nielsen was incarcerated at the Sarpy County jail testified that incoming calls to Nielsen were not logged, nor were phone calls made by Nielsen at times he had unlimited access to a telephone in his cell, so any additional calls made to Nielsen from his counsel, or from Nielsen to his counsel, would not be reflected in the log.

The adequacy of counsel cannot be determined solely on the basis of the amount of time counsel spent interviewing a client. *State v. Hochstein*, 216 Neb. 515, 344 N.W.2d 469 (1984), *cert. denied* 469 U.S. 873, 105 S. Ct. 226, 83 L. Ed. 2d 156. Nielsen has failed to establish that his trial counsel spent an inadequate amount of time with him in preparing for trial. Neither has Nielsen shown that he was prejudiced by counsel's failure to spend additional time with him.

As to Nielsen's complaint that trial counsel failed to cross-examine Dr. Bruns in a timely fashion, the record shows that direct examination of Bruns was not completed until 5:15 p.m. on April 19, 1978, at which time Nielsen's trial counsel felt it was too late to begin cross-examination. Cross-examination was then scheduled for April 21 at 9 a.m., the next time Dr.

Bruns was available. Nielsen has made no showing as to how this delayed cross-examination of Dr. Bruns operated to his prejudice. In fact, the delay allowed Nielsen's counsel to obtain a transcribed copy of Dr. Bruns' direct examination and to cross-examine Dr. Bruns on his testimony line by line, carefully eliciting corroboration of Nielsen's claimed intoxication and evidence of its effect on Nielsen's ability to formulate the intent to commit first degree murder. This conduct by Nielsen's trial counsel does not support an ineffectiveness of counsel claim.

## INVOLUNTARY MANSLAUGHTER DEFINITION AND INSTRUCTION

Next, the defendant claims that his counsel was ineffective because he failed to request an instruction defining involuntary manslaughter and explaining the difference between voluntary and involuntary manslaughter. The record reflects that the jury was instructed on murder in the first degree, murder in the second degree, and manslaughter. At the time of Nielsen's trial, Neb. Rev. Stat. § 28-403 (Reissue 1975) provided, "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter . . . ." This court recently held in *State v. Carter*, 241 Neb. 645, 659, 489 N.W.2d 846, 857 (1992):

> By finding the defendants guilty of the greater offense, first degree murder, the jury not only determined that the defendants had *intentionally* killed the victim, but it also found that the defendants killed the victim *purposely and with deliberate and premeditated malice*. [Citations omitted.] To have found the defendants guilty of only manslaughter, the jury would have had to find that the defendants acted without malice when they killed the victim. [Citation omitted.]

When the jury convicted Nielsen of first degree murder and declined to convict him of manslaughter, it was necessarily convinced beyond a reasonable doubt that Nielsen had intentionally and with deliberate and premeditated malice killed Edward Grabbe. To have found Nielsen guilty of manslaughter, the jury would have had to find that he acted

*without* deliberate and premeditated malice, a finding inconsistent with the verdict rendered.

Moreover, the jury was instructed that if it found Nielsen guilty of murder in the first degree it was not to consider the lesser-included offenses set forth in the instructions. Once the jury found Nielsen guilty of first degree murder, any further instruction defining voluntary and involuntary manslaughter obviously would have been of no benefit to Nielsen, and he was not prejudiced by its absence.

## CONCLUSION

The record fails to reflect that Nielsen was prejudiced in any way by trial counsel's admittedly novel trial strategy. The district judge who presided over Nielsen's postconviction hearing was not clearly wrong in his finding that Nielsen is not entitled to postconviction relief. We thus affirm the order of the district court denying Nielsen's motion for postconviction relief.

AFFIRMED.