**Wilfred W. NIELSEN, Petitioner– Appellant,**

v.

**Frank X. HOPKINS, Warden, Nebraska State Penitentiary, Respondent– Appellee.**

No. 94–2401.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1995.

Decided July 6, 1995.

---

Alan E. Peterson, Lincoln, NE, argued, (Andrew D. Strotman on the brief), for appellant.

Barry K. Waid, Lincoln, NE, argued, for appellee.

Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WILL,* Senior District Judge.

* The HONORABLE HUBERT L. WILL, Senior United States District Judge for the Northern District of Illinois, sitting by designation.
1. The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, adopting the report and recommendation of the Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska.

HANSEN, Circuit Judge.

Wilfred W. Nielsen appeals from the judgment of the district court[1] dismissing his petition for habeas corpus relief under 28 U.S.C. § 2254. Nielsen argues that his counsel was ineffective for taking actions which he argues were equivalent to pleading him guilty without his consent. We affirm.

## I.

A review of the Nebraska Supreme Court's decision in *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993), reveals the following:

On November 19, 1977, Nielsen arrived at the home of his wife's parents, Edward and Opal Grabbe, looking for his wife, with whom he had had an argument earlier in the day. The Grabbes and their son, Rick, were home when Nielsen arrived. Nielsen, who was an experienced commercial hunter, entered the Grabbe home with a fully-loaded high-powered rifle and subsequently fired one shot into the kitchen floor, a second shot through a kitchen window sill, and a third shot through the kitchen wall. Nielsen, "in a command-type voice," then told Edward Grabbe "[l]et's go outside." *Id.*, 498 N.W.2d at 534. Edward asked if he could put his coveralls on first, and Nielsen responded "[y]ou won't be needing them." *Id.* Nielsen and Edward Grabbe then went outside. At some point Nielsen shot Edward Grabbe and then Opal Grabbe, who apparently had followed the men outside. Rick Grabbe managed to hide from Nielsen until Nielsen left the premises and Rick later testified at trial for the prosecution.

Nielsen was charged with two counts of first-degree murder. He was tried first on the charge that he murdered Edward Grabbe. Nielsen retained S.J. Albracht to represent him. Faced with strong evidence that Nielsen had committed the offenses,[2]

2. This evidence included: Rick Grabbe's testimony; Nielsen's statements to law enforcement officers that he threw the rifle that was used to shoot the Grabbes in the Missouri River; later showing the officers where he threw the weapon into the river (the weapon was never found); and statements that Nielsen made while incarcerated to

Albracht decided to focus on Nielsen's mental state at the time of the shootings. He had Nielsen examined by three psychiatrists and a psychologist to determine whether Nielsen was sane at the time of the shootings. All four concluded that Nielsen was sane when he shot the Grabbes.

Albracht then focused on an intoxication theory which, although only a partial defense under Nebraska law, would allow a jury to determine that because of his intoxicated state at the time of the shootings, Nielsen was unable to form the requisite intent to commit first-degree murder. *See State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405, 424 (1990). The evidence indicated that at the time of his arrest, Nielsen was intoxicated, that he was a chronic alcoholic who had received extensive treatment prior to the date of the offenses, and that prior to the shootings he had not consumed alcohol for almost four months. Nielsen claimed that on the day of the shootings he consumed approximately 13–15 cans of beer and an unspecified amount of whiskey, which left him so impaired that he did not remember many of the day's events.

However, Albracht encountered difficulty obtaining corroboration of Nielsen's intoxication claim. Albracht interviewed a number of witnesses who had encountered Nielsen on the day of the shootings, and none were willing to testify that he was intoxicated. Albracht also knew that the prosecution was going to call many of these witnesses to rebut any claim that Nielsen was intoxicated. Albracht weighed the possible methods by which evidence of Nielsen's intoxication could be presented, decided against having an expert witness testify for the defense, and instead decided to attempt to establish the intoxication claim through cross-examination of a prosecution witness.

Accordingly, Albracht filed a notice of intent to pursue an insanity defense. He testified at the postconviction hearing that upon filing this notice, he knew the court would require Nielsen to undergo a psychiatric evaluation by a court-appointed physician. He hoped to acquire favorable evidence regarding intoxication in the course of this examination. Under Nebraska law at the time, the prosecution was required to prove that Nielsen was not insane at the time of the shooting and would likely use the examining physician to establish this point. *See Nielsen*, 498 N.W.2d at 540–41. Albracht testified that the prosecution would have a difficult time disputing a conclusion from its expert that Nielsen was intoxicated at the time of the shootings after using the same expert's testimony to establish that Nielsen was not insane. Further, he believed that the expert's testimony would also be strong evidence to negate the testimony from the prosecution's other witnesses who saw Nielsen on the day of the shootings and would testify that he was not intoxicated.

The court appointed Dr. William C. Bruns, a psychiatrist, to examine Nielsen. Dr. Bruns assembled a detailed written report outlining his conclusions regarding both Nielsen's sanity and his intoxication on the date of the shootings. The report was made available to Albracht several days prior to trial. At trial, without an objection from the defense, Dr. Bruns testified on behalf of the prosecution, and his written report was introduced into evidence. Dr. Bruns' testimony closely mirrored the information contained in his written report. Albracht testified at the postconviction hearing that he allowed Dr. Bruns to testify at trial without objection because he "saw nothing in the report that was harmful" to Nielsen. (Jt.App. at 521.)

Dr. Bruns concurred in the conclusions of the prior examining physicians that Nielsen was not insane at the time of the shootings. Dr. Bruns also testified that during the examination, Nielsen admitted to "being very angry at the time" of the shootings and that he remembered "aiming the gun and shooting Mr. Grabbe." (*Id.* at 112–13.) When the prosecution concluded its examination of Dr. Bruns, Albracht was permitted to delay cross-examination for several days, which allowed the court reporter to transcribe Dr. Bruns' testimony. Albracht was then able to scrutinize Dr. Bruns' testimony on direct examination in a line-by-line fashion.

his friend John Blatter that he shot Edward

Grabbe after Grabbe attempted to grab the gun.

During his cross-examination of Dr. Bruns, Albracht was able to elicit favorable testimony by pointing out specific references in the direct examination where Dr. Bruns made statements which supported the intoxication defense. Dr. Bruns stated that when Nielsen was intoxicated, he had minimal control over his impulses. (*Id.* at 167–68.) Dr. Bruns also admitted that Nielsen could not evaluate his intent before acting and that if Nielsen had not been intoxicated it was possible that he would have realized that he should not commit the acts. (*Id.* at 168–69.) Finally, Dr. Bruns testified that Nielsen was in an alcoholic blackout prior to his arrival at the Grabbe farm and immediately after his departure from the premises. (*Id.* at 162–63.) Nielsen later testified that he was so highly intoxicated on the date of the shootings that he was unable to remember many events which occurred.

At the conclusion of the trial evidence, the court instructed the jury that it could find Nielsen: (1) guilty of first-degree murder; (2) guilty of second-degree murder; (3) guilty of manslaughter; (4) not guilty by reason of insanity; and (5) not guilty. The court also instructed the jury that it could consider Nielsen's intoxication in assessing whether he was "capable of deliberation, premeditation, or having the intent charged." (*Id.* at 49.)

The jury found Nielsen guilty of first-degree murder. The state trial judge, relying heavily on Dr. Bruns' conclusion that Nielsen was intoxicated when he shot Edward Grabbe, sentenced Nielsen to life imprisonment rather than imposing a sentence of death. The Supreme Court of Nebraska affirmed Nielsen's conviction and sentence. *See State v. Nielsen,* 203 Neb. 847, 280 N.W.2d 904 (1979). Nielsen subsequently filed a state postconviction petition which the trial court denied and the Nebraska Supreme Court affirmed. *See Nielsen,* 498 N.W.2d at 527.

Nielsen then filed this habeas petition, alleging a myriad of claims that his trial and appellate counsel were ineffective. The state moved to dismiss the petition on the grounds of the "concurrent sentence" doctrine and "laches." The magistrate recommended denying the state's motion to dismiss but, without conducting a hearing, simultaneously recommended denying the petition on the merits. The district court adopted the magistrate's report and recommendation. Nielsen appeals.[3]

## II.

"Dismissal of a [habeas] petition without a hearing is [ ] proper if there is no dispute as to the facts, or if the dispute can be resolved on the basis of the record." *Amos v. State of Minn.,* 849 F.2d 1070, 1072 (8th Cir.1988). In this case, Nielsen does not dispute the facts as found by the state courts. Thus, "we defer to the factual findings of the state court and presume them to be correct in the absence of any showing otherwise, and we review the legal conclusions of the lower court de novo." *Culkin v. Purkett,* 45 F.3d 1229, 1232 (8th Cir.1995) (internal quotations and citations omitted).

Nielsen argues that Albracht rendered ineffective assistance of counsel by using a strategy of cross-examination of Dr. Bruns to establish intoxication, which placed before the jury his statements to the psychiatrist that he remembered "being very angry" and "aiming the gun and shooting Mr. Grabbe." Nielsen contends that this strategy, to which he did not consent, was the functional equivalent to pleading him guilty to first-degree murder because the statements were an admission that he possessed the requisite mental state for the offense.[4] He points out that an attorney may not enter a plea of guilty, or its equivalent, without a defendant's consent. *See Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). He argues that prejudice is inherent in this type of ineffective assistance claim and thus, under *United*

---

**3.** Nielsen later pleaded no contest to second-degree murder for the death of Opal Grabbe and received a concurrent life sentence. *Id.* at 534. That conviction has not been challenged in this habeas petition.

**4.** Nielsen concedes he shot Ed Grabbe, thus satisfying the *actus reus* aspect of the offense.

*States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), he need not show prejudice in order to be entitled to relief.

In *Cronic,* the Supreme Court outlined several circumstances in which prejudice to a defendant is so likely and inherent that no specific showing of prejudice is required in order for the claimant to be entitled to relief. *Id.* at 658, 104 S.Ct. at 2046. Those circumstances are: (1) "if the accused is denied counsel at a critical stage of the trial"; (2) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where "the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance...." *Id.* at 659–61, 104 S.Ct. at 2047–48. The circumstances to which *Cronic*'s presumption of prejudice applies are very limited in number. *Fink v. Lockhart,* 823 F.2d 204, 206 (8th Cir.1987).

Nielsen does not contend that any of the circumstances explicitly delineated in *Cronic* apply in this case. He argues instead that where counsel enters an unconsented guilty plea, prejudice is so likely and inherent that *Cronic*'s standard should be applied to such cases as well.

■ Even if we assume for the sake of argument that *Cronic* applies in such circumstances, we nevertheless ·find that the present case is not such a circumstance because Albracht's trial strategy was not the functional equivalent of a guilty plea. Given the overwhelming evidence that Nielsen shot Edward Grabbe, Albracht decided his best approach was to attempt to prove that Nielsen was intoxicated at the time of the shooting. Although intoxication is not a complete defense under Nebraska law, it allows the jury to find that a defendant was incapable of forming the requisite intent to be guilty of first degree murder.[5] *See Reynolds,* 457 N.W.2d at 424 ("evidence of intoxication may be admissible as a circumstance tending to negative the assertion that a defendant acted with deliberation or premeditation").

■ By allowing Dr. Bruns to testify and using cross-examination of him to attempt to establish intoxication, Albracht was able to obtain testimony very favorable to his client's intoxication defense. Albracht elicited extensive testimony from Dr. Bruns about Nielsen's intoxication and the effect that such intoxication could have had on Nielsen's ability to deliberate concerning his actions and the consequences of the acts. Dr. Bruns admitted that Nielsen could "not stop and objectify what his intent was and to think about—to think about it for a while before acting," (Jt.App. at 168.), and that "[i]f he was not intoxicated there's a possibility that he might have thought long enough before shooting to realize that he shouldn't follow through with this impulsive act," (*Id.* at 169). The strategic decision to use the cross-examination of Dr. Bruns to establish intoxication was far from a concession of guilt. Instead, it created a direct conflict in the State's evidence as to whether Nielsen possessed the requisite mental capacity at the time he shot Edward Grabbe to be found guilty of first-degree murder under Nebraska law.

Although pursuant to this strategy Albracht did not challenge that Nielsen shot Edward Grabbe, at no time did Albracht concede that Nielsen possessed the necessary intent for first-degree murder under Nebraska law. Nielsen emphasizes that the strategy of allowing Dr. Bruns to testify on direct examination for the prosecution that Nielsen remembers "being very angry" and "aiming the gun and shooting Mr. Grabbe" was a concession that he possessed the requisite intent to be convicted of first-degree murder under Nebraska law. We disagree. First, as noted above, Albracht's later cross-examination of Dr. Bruns placed before the jury strong evidence that Nielsen lacked the necessary mental capacity to be found guilty of first-degree murder. More importantly, Albracht made a reasoned judgment that the favorable testimony that Dr. Bruns would provide concerning intoxication would more than offset whatever damage his testimony on direct examination would cause. *See United States v. King,* 484 F.2d 924, 927–28

---

5. On the date that Edward and Opal Grabbe were shot, Nebraska law defined first-degree murder as "[w]hoever shall purposely and of deliberate and premeditated malice ... kill another ... shall be guilty of murder in the first degree...." Neb.Rev.Stat. § 28–401 (1943).

(10th Cir.1973) (counsel made strategic decision to allow defendant's former attorney to testify for the Government believing that favorable testimony obtained on cross-examination would outweigh harmful damaging testimony from direct examination). Finally, as a practical matter, we are not persuaded that not objecting to Dr. Bruns' direct testimony, including the "angry" and "aiming" statements, is the equivalent of an attorney stating directly to a jury that his client is guilty of the crime charged.[6]

The facts of this case are similar to those we encountered in *Parker v. Lockhart*, 907 F.2d 859 (8th Cir.1990). In *Parker*, the petitioner was convicted of first-degree murder and sentenced to life imprisonment. *Id.* at 859. He argued that his counsel was ineffective for stipulating that he fired the weapon causing the gunshot wound that killed the victim. *Id.* at 860. Counsel stated that he did not believe that he could refute the state's evidence that the petitioner shot the victim, based on the victim's dying declaration and eyewitness testimony. *Id.* Accordingly, counsel made the stipulation, which he hoped would focus the jury's attention on circumstances surrounding the shooting which might have tended to suggest provocation. *Id.* We held that counsel was not ineffective because the stipulation did not prevent counsel from arguing that the state failed to prove premeditation, thus allowing the jury to find that petitioner was guilty of second-degree murder. *Id.* at 861. Much like the present case, "[t]he proof that [petitioner] shot [the victim] was irrefutable absent the stipulation, and the stipulation was irrelevant to [the petitioner's] state of mind when he shot the victim." *Id.*

Although Albracht's trial strategy was somewhat unorthodox and ultimately proved unsuccessful, it gave the jury a plausible reason to acquit Nielsen of first-degree murder. Even if we assume for the purposes of this case that *Cronic*'s presumption of prejudice applies where counsel concedes a client's guilt without the client's consent, Albracht's trial strategy did not amount to such a concession.[7]

Nielsen next contends that even if Albracht was not ineffective under the *Cronic* standard, he was ineffective under the standard outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim of ineffective assistance under *Strickland*, a claimant must demonstrate "that counsel's performance was deficient," and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In determining whether counsel's performance was deficient, we must keep in mind that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690, 104 S.Ct. at 2066. *See also Smith v. Jones*, 923 F.2d 588, 590 (8th Cir. 1991) ("[c]ounsel's strategic choice is entitled to great deference"). In assessing counsel's performance, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. However, this presumption is inappropriate if counsel's strategic decisions are made after an inadequate investigation. *See Laws v. Armontrout*, 863 F.2d 1377, 1384–85 (8th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989).

Nielsen does not contend that Albracht conducted an inadequate investigation into the law or the facts; rather, he merely reit-

6. Therefore, we find the instant case distinguishable from those Nielsen cites in which courts have found constitutional violations for counsel's admission of the client's guilt. *See, e.g., Francis v. Spraggins*, 720 F.2d 1190, 1194–95 (11th Cir. 1983) (counsel ineffective for stating in closing argument that defendant is guilty of crime charged, although client maintained innocence), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *Wiley v. Sowders*, 647 F.2d 642, 649–50 (6th Cir.1981) (counsel ineffective for stating in closing argument that defendant was "guilty," "guilty as charged," and "guilty beyond a reasonable doubt" without client's con-

sent and where client asserted innocence); *Cox v. Hutto*, 589 F.2d 394, 396 (8th Cir.1979) (due process violation found where counsel stipulated to the existence of several prior offenses which were used for sentence enhancement without client's consent).

7. In reaching this conclusion, we need not address the determination of the Supreme Court of Nebraska that Nielsen consented to, and actively participated in, Albracht's strategy to use Dr. Bruns to corroborate Nielsen's claims of intoxication. *Nielsen*, 498 N.W.2d at 537.

erates his earlier argument that Albracht was ineffective for using a strategy which he believes was the functional equivalent of an unconsented guilty plea. Nielsen also contends that if Albracht deemed Dr. Bruns' testimony necessary, at a minimum he should have filed a motion in limine to exclude the "angry" and "aiming" statements. He also argues that Albracht was ineffective for failing to obtain expert witnesses to testify for the defense on the issue of intoxication.

The Supreme Court of Nebraska determined that these actions were matters of trial strategy. *Nielsen,* 498 N.W.2d at 536–38, 542. "Absent contrary evidence, we accord this finding of fact a presumption of correctness under 28 U.S.C. § 2254(d), and we decline to second-guess counsel's strategic decision on collateral review." *Dodd v. Nix,* 48 F.3d 1071, 1075 (8th Cir.1995). Nielsen presents no evidence that Albracht's actions were anything other than strategic decisions made by counsel. Thus, we decline to "second-guess" Albracht's strategic decisions here and accordingly hold that Nielsen's claims of ineffective assistance fail under *Strickland.*

### III.

For the reasons enumerated above, we affirm the judgment of the district court.