STATE OF NEBRASKA, APPELLEE, V.
NECDET CANBAZ, APPELLANT.
705 N.W.2d 221

Filed October 28, 2005.   No. S-04-970.

W. Russell Bowie for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

Necdet Canbaz appeals from the order of the district court denying Canbaz' motion for postconviction relief after an evidentiary hearing.

## BACKGROUND

Following a 2004 jury trial resulting in guilty verdicts, Canbaz was convicted of first degree murder and use of a weapon to commit a felony in the shooting death of Debora Peralta. His convictions and sentences were affirmed by this court on direct appeal in *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000). The underlying facts as set forth in *Canbaz* are repeated here:

> Peralta and Canbaz began a relationship in approximately 1992 and lived together in Canbaz' home for approximately 4 years prior to Peralta's death. In early July 1998, Peralta ended the relationship with Canbaz and moved out. Canbaz was very upset and angry with Peralta for ending the relationship. He made statements to neighbors and coworkers

that he was angry with Peralta and wanted to hurt her and kill her and her family members.

On September 5, 1998, Canbaz took Peralta out for dinner. They then spent the night at Canbaz' home. Canbaz left the following morning, and when he returned home around midday, Peralta was gone.

Peralta had returned to her apartment. At about 12:20 p.m., Peralta called the Sarpy County Family Service Domestic Abuse Program from her apartment. She spoke with Theresa Hamilton, who worked for Family Service, asking questions and seeking general information. After about 2 minutes of conversation, Peralta became very frantic and the pitch of her voice rose. She said, "[H]elp, help. He's coming in. He's coming in. Call the police." Hamilton then heard Peralta screaming, after which a man came on the line and said hello three times. Hamilton did not answer, and after about 30 seconds, she disconnected and called the 911 emergency dispatch service, giving them Peralta's telephone number.

Peralta ran outside. Canbaz ran after her and shot her in the back of the head. Peralta collapsed on the sidewalk. Canbaz came up to her and shot her again in the neck. Canbaz then left the scene in his Jeep and later went to his ex-wife's home. He left his ex-wife a note saying that he had killed Peralta. The police, acting on information received from several witnesses to the shooting, arrested Canbaz later that day [in a Council Bluffs, Iowa, hotel room]. After being properly informed of his *Miranda* rights, Canbaz gave a statement to the police.

In Canbaz' statement to the police, he admitted that he was very upset when Peralta moved out. He admitted that Peralta took out a protection order against him after the move because she was scared. He admitted that he had a sale in late August to dispose of his belongings. He admitted that he went to Peralta's apartment the day of the shooting, purportedly to recover $30,000 which she had taken from him when she left his home earlier that day. Canbaz stated Peralta was on the telephone when he pushed away some bookcases blocking the door and entered the apartment and

that he picked up the receiver and said hello. Further, he admitted that as they were leaving the apartment, Peralta ran away from him and that he shot her. He also stated he had an airline ticket to leave for Turkey to see his father, with a departure date a few days after the shooting. However, he denied ever saying that he would kill Peralta or her family.

259 Neb. at 584-86, 611 N.W.2d at 398-99.

Prior to trial, a hearing had been held to determine the voluntariness of Canbaz' statement to the police. The statement was taken in an interview room at the Council Bluffs police station. One of the officers present for the statement testified that Canbaz was advised of his *Miranda* rights and that care was taken to make sure he understood the things he was being questioned about and the rights that he had. The officer believed that Canbaz understood and waived his right to have appointed counsel present at that time. At no time did any officer threaten Canbaz or use force or make promises to induce Canbaz into making a statement. The officer described Canbaz as very cooperative. Canbaz did not ever state an unwillingness to talk about the shooting or make any other complaint. The officer testified that it did not appear that Canbaz was under the influence of alcohol or drugs. Rather, it appeared that Canbaz understood what was occurring, understood what he was saying, and was not confused. Canbaz, in the statement, explained that he had given the statement freely and voluntarily, and he declined to add or change anything in the statement. After the hearing, the trial judge specifically found with respect to Canbaz' statement that Canbaz had been given his *Miranda* rights at the time of the interview and that Canbaz had voluntarily, knowingly, and intelligently waived his privilege against self-incrimination and his right to have appointed counsel present at the interrogation. The court found that Canbaz' statement was freely, voluntarily, knowingly, and intelligently made.

Canbaz did not raise an insanity defense, but instead introduced expert medical testimony from Dr. Bruce D. Gutnik in an effort to negate the State's evidence of premeditation. In a hearing on the prosecution's motion in limine regarding Gutnik's testimony, trial counsel explained that he did not seek to put forth an "irresistible impulse" defense, which is not recognized by

Nebraska law. Trial counsel's theory was that when Peralta ran, Canbaz reacted impulsively, and not out of premeditation. This, trial counsel explained, was wholly distinct from an "irresistible impulse." The trial court ruled that it would allow testimony as to the issue of impulsive behavior being a part of Canbaz' mental condition generally, but would not allow Gutnik to testify as to Canbaz' mental state specifically at the time of the shooting.

Gutnik testified at trial that at the time of the shooting, Canbaz was suffering from a major depressive disorder with psychosis, panic disorder, and disassociative amnesia. However, Gutnik also testified that Canbaz could, at the time this incident occurred, form an intent of action. Gutnik testified, without objection, that people like Canbaz with a major depressive disorder can have trouble with memory and with thinking clearly at times and that this condition leads to impulsivity. He further testified that he would expect a person suffering from that condition to have his or her judgment "impaired." Gutnik elaborated that a person suffering from a condition such as Canbaz' would have his or her judgment "clouded," as if looking "through a fog or a cloud and you can't quite see all the information around you, and what you do see is distorted. So you are making judgment calls based on partial information and distorted information." With regard to the disassociative amnesia aspect of Canbaz' diagnosis, Gutnik testified that one was much more likely to have disassociative amnesia, or not remember details about an event, if that event were not planned.

After Gutnik testified, the State called Dr. Y. Scott Moore as a rebuttal witness concerning Gutnik's testimony. Moore opined that Canbaz was not suffering from a major depressive disorder at the time of the shooting because Canbaz did not display significant characteristics common to a major depressive disorder. Moore also opined that Canbaz was not suffering from disassociative amnesia because Canbaz was able to give a clear account of the events which occurred during, prior to, and after the shooting.

During closing argument, trial counsel argued that Canbaz was not denying responsibility for killing Peralta or claiming to have been insane at the time of the killing. However, trial counsel argued that Canbaz' mental condition was relevant to deciding

what crime he had committed. Trial counsel stated that in order for an act to be first degree murder, it must be deliberate, such that the defendant considered the probable consequences of his or her act before committing it. Trial counsel explained to the jury that all the elements of first degree murder combine to mean, in simple terms, that the defendant must have a plan. Trial counsel then proceeded to illustrate how Canbaz did not in fact have such a plan. Trial counsel argued to the jury that at the time of the shooting, Canbaz was "clearly upset, clearly confused, scared, and obviously feeling a sense of betrayal from the events that had just taken place." He pointed out that Canbaz was suffering from a major psychotic depression that impaired his ability to think clearly, impairing his judgment and clouding his reasoning. Trial counsel characterized the shooting as an "impulsive" act. At this point, the prosecution objected on the ground that such was not a legal argument under Nebraska law, but the trial court overruled the objection.

Trial counsel then proceeded to argue that the jury should find Canbaz guilty of the lesser crime of manslaughter because the shooting was the result of a sudden quarrel, defined as a "passion, suddenly aroused, which clouds reason and prevents rational action." Trial counsel then explained:

> "Clouds," that's exactly the terminology that Dr. Gutnick [sic] used in describing his mental condition. It does not necessarily require an exchange of angry words or an altercation contemporaneously with the killing and does not require a physical struggle or other combative corporal contact between the defendant and the victim. They don't have to get into a fisticuffs for this to take place.

In the prosecution's rebuttal during closing arguments, the prosecutor stated:

> [T]he definition of sudden quarrel means a legally recognized and sufficient provocation causing a reasonable person to lose normal self-control. A quarrel is an argument. It's a fight between people. That's what a manslaughter is, people punching each other, hitting each other, getting in a fight and somebody dies.
>
> This isn't any quarrel by any stretch of the imagination. Don't be fooled by going along with what defense counsel

wants in this case, a manslaughter. This is no manslaughter case.

Trial counsel objected to the use of the word "fooled," and the trial court overruled the objection.

The instructions given by the trial court to the jury defined the "sudden quarrel" element of manslaughter as

> a legally recognized and sufficient provocation causing a reasonable person to lose normal self-control; or passion suddenly aroused which clouds reason and prevents rational action. It does not necessarily require an exchange of angry words or an altercation contemporaneous with the killing and does not require a physical struggle or other combative corporal contact between the Defendant and the victim.

Canbaz filed a motion for postconviction relief on February 13, 2004. The deposition testimony of trial counsel for Canbaz was entered into evidence at the postconviction hearing. Trial counsel explained that he did not file a motion to suppress the evidence found in the search of Canbaz' vehicle because Canbaz had consented to the search. He did not want to risk alienating the jury by making objections that were going to be overruled. Trial counsel explained that he did not make a motion to suppress Canbaz' statement to the police because Canbaz had been advised of his *Miranda* rights and that the indication was Canbaz had voluntarily waived those rights. Trial counsel stated that he believed he had discussed the voluntariness of the statement with Canbaz and that a decision was made not to proceed with a motion to suppress.

Trial counsel testified that when discussing the case with Canbaz, he always did so in English and had no trouble communicating with Canbaz in that language. Canbaz always appeared to understand what trial counsel was saying, and trial counsel understood Canbaz' responses, which were appropriate to the questions being asked. At no point did Canbaz request an interpreter skilled in his native language. It was trial counsel's judgment that he was communicating appropriately with Canbaz in English, and trial counsel stated that had it been otherwise, he would have sought an interpreter.

Trial counsel stated that Canbaz had been able to describe to him all of the events that occurred the day of the shooting, but

that there was some indication that Canbaz did not remember clearly the shooting itself. Canbaz never denied actually killing Peralta. Trial counsel stated that he had retained Gutnik to do an evaluation for purposes of competency to stand trial and also with regard to Canbaz' mental status on the date of the shooting. He did not believe that Gutnik's evaluation supported an insanity defense. Trial counsel stated that because his research had indicated that "irresistible impulse" was not a recognized defense to first degree murder under Nebraska law, "irresistible impulse" was not the nature of Canbaz' defense. Trial counsel described his trial strategy instead as trying to avoid a conviction for first degree murder by showing a lack of premeditation.

Trial counsel also testified as to why he did not object to the prosecution's statement made in its rebuttal closing argument that under the definition of a sudden quarrel, people have to be "punching each other, hitting each other, getting in a fight and somebody dies." Trial counsel said that although he could not recall specifically, it was his opinion that "objecting to opposing counsel's closing argument can have technical consequences with regard to [counsel's] relationship and rapport with the jury." Furthermore, trial counsel testified that objections made during closing arguments usually receive a negative reaction from the judge, thereby conveying to the jury that counsel's actions are inappropriate. Trial counsel stated that such objections also have the possibility of "creating a negative reaction from the jury members themselves with regard to [counsel's] conduct, irrespective of how the judge handles it." Trial counsel stated that he did object to the prosecutor's statement that the jury "shouldn't be fooled" by trial counsel's manslaughter argument. He noted that he had already argued the proper legal definition of sudden quarrel and that the proper definition was found in specific jury instructions.

The deposition testimony of Canbaz was also entered into evidence at the postconviction hearing. Canbaz had the services of an interpreter, although he answered many questions himself in English and before the interpreter had interpreted the questions. Canbaz' postconviction counsel reminded him on a couple of occasions to answer in Turkish "so that there isn't any confusion." Canbaz explained that for the last 20 years, he had

lived in Nebraska and had communicated mostly in English. He admitted that he had some trouble answering in Turkish since it had been a long time since he had spoken the language. Canbaz stated that when he gave his statement to the police, the police spoke English, and that he understood some of the things they were asking him, but not everything. He did not ask them for an interpreter. Canbaz testified that he had told trial counsel that he did not know English, but that trial counsel had stated that Canbaz did not need an interpreter because trial counsel "would defend [him] and would say everything on [his] behalf." Canbaz stated that when he was examined by Gutnik, the conversation was in English and that he did not "exactly" understand all his questions. However, he did understand some of the questions. Canbaz testified that he did not recall any conversation with trial counsel regarding whether to make a motion to suppress.

The postconviction court denied Canbaz' motion for postconviction relief. The court found that a warrant for Canbaz' arrest had been issued for murder in the first degree and use of a weapon to commit a felony. The postconviction court delineated the facts supporting reasonable cause for the warrant and found that the search of the hotel room was pursuant to the arrest. The court found that Canbaz had given both verbal and written consent to search his vehicle. The court further found that Canbaz was advised of his *Miranda* rights at that time and voluntarily gave the officers the key to his vehicle. Regarding the statement, the postconviction court again noted that Canbaz had been notified of his *Miranda* rights and had voluntarily waived those rights. The trial court had held a hearing on the voluntariness of Canbaz' statement and had found the statement to be voluntary. The postconviction court concluded that trial counsel's decision not to object to any of the evidence from the searches or to the statement was a tactical decision presumed to be reasonable. The postconviction court further found that even if counsel had been deficient, the outcome of the trial would not have changed. The court noted that Canbaz had been dating Peralta, that Peralta had a protection order against him, and that witnesses observed Peralta being shot by a man fitting Canbaz' description and the man then driving away in a red Jeep with a license number matching the Jeep registered to Canbaz.

On the issue of Canbaz' alleged diminished mental capacity, the postconviction court found that the goal at the time of trial was to avoid a conviction of first degree murder. The court found that trial counsel was aware that "irresistible impulse" was not a defense. Trial counsel did not set forth such a defense, but instead based the defense on lack of premeditation and sudden quarrel, in an attempt to procure a conviction of manslaughter rather than first degree murder. The trial court instructed the jury on manslaughter and sudden quarrel. The postconviction court concluded that it would not second-guess reasonable strategic decisions by trial counsel, and it could find no alleged deficiency that would have changed the outcome of the case.

Canbaz appeals from the denial of postconviction relief.

## STANDARD OF REVIEW

■ Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005).

■ In an evidentiary hearing, as a bench trial provided by Neb. Rev. Stat. § 29-3001 et seq. (Reissue 1995) for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and weight to be given a witness' testimony. In an appeal involving a proceeding for postconviction relief, the trial court's findings will be upheld unless such findings are clearly erroneous. *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992).

## ASSIGNMENT OF ERROR

Canbaz assigns that the trial court erred in failing to grant postconviction relief.

## ANALYSIS

Canbaz was represented by the same counsel at trial and on direct appeal, and therefore, he is not procedurally barred from

asserting a claim of ineffective assistance of counsel. See, *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003); *State v. Billups*, 263 Neb. 511, 641 N.W.2d 71 (2002).

We first note that it is not entirely clear from Canbaz' brief whether he might be trying to argue that trial counsel failed to subject the prosecution's case to meaningful adversarial testing, and therefore prejudice should be assumed under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). For instance, without further elaboration as to how he has been prejudiced, or even exactly how trial counsel was deficient, Canbaz points out that his trial counsel did not file any pretrial motions and that trial counsel was the one who identified and offered the note purportedly authored by Canbaz stating that he had killed Peralta. Canbaz similarly complains that trial counsel should have tested the prosecution's case before calling Gutnik because Gutnik admitted on cross-examination that Canbaz told Gutnik that he had killed Peralta. Also mentioned is the fact that trial counsel failed to object to (1) a police officer's identification of the source of a page made to Peralta the day she was killed as coming from Canbaz' home and (2) the prosecution's referral to the person who shot Peralta as "the defendant," "although there was never any identification of Canbaz as the shooter by any eyewitness." Brief for appellant at 11. Finally, without making any assertion that Canbaz would have testified or did want to testify or that such testimony would have changed the outcome of the case, Canbaz seems to make some complaint about trial counsel's deciding not to call Canbaz to testify in his own defense. Canbaz concludes at one point in his brief: "Trial counsel abandoned the defendant by failing to test the prosecution's case at all. Canbaz may as well have proceeded pro se." *Id.* at 7.

In *United States v. Cronic*, 466 U.S. at 659, the U.S. Supreme Court explained that where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." In *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000), we elaborated that prejudice will be presumed: (1) where the accused is completely denied counsel at a critical stage of the proceedings, (2) where

counsel fails to subject the prosecution's case to meaningful adversarial testing, and (3) where the surrounding circumstances may justify the presumption of ineffectiveness without inquiry into counsel's actual performance at trial. Prejudice will also be presumed where there is an actual conflict of interest among multiple defendants jointly represented by the same counsel. See, *United States v. Cronic, supra*; *State v. Trotter, supra*. Nothing in the evidence before us supports a claim that Canbaz' trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, and therefore, our analysis of Canbaz' complaints will be conducted under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Under *Strickland*, to establish a right to relief because of a claim of ineffective counsel at trial or on direct appeal, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. The defendant must also show that counsel's deficient performance prejudiced the defense in his or her case. To prove prejudice, the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. When a defendant challenges a conviction, the question is whether there is a reasonable probability that absent the errors, the fact finder would have had a reasonable doubt concerning guilt. See *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003).

### CANBAZ' STATEMENT

Trial counsel testified that he did not object to the admission of Canbaz' confession because Canbaz had been advised of his *Miranda* rights and the indication was that he had voluntarily waived those right. Trial counsel further testified that he believed he had discussed with Canbaz whether to make a motion to suppress the confession and that a decision was made not to proceed with such a motion, although Canbaz' deposition testimony denies this. Canbaz claims that the failure of trial counsel

to object to the confession deprived him of effective assistance of counsel.

Canbaz states: "The only evidence prior to trial that Canbaz was Mirandized came at a hearing to determine the voluntariness of his statement, given after he was removed from his hotel room, and after he gave consent to search his car." Brief for appellant at 9. However, the import of said facts in an ineffective assistance of counsel analysis is never explained.

Canbaz further alleges that trial counsel should have investigated whether the confession was in fact voluntary. Specifically, Canbaz asserts that his trial counsel was deficient in failing to investigate the possibility that Canbaz' use of prescription anti-depressants and his "history of mental illness," coupled with his lack of proficiency in English and "the strain of the situation," deprived him of a minimal understanding of his statements. *Id.* at 13. With regard to whether this failure to investigate prejudiced him, Canbaz states only that it "may have been the situation" that Canbaz was unable to understand the meaning of his statements. *Id.* at 12. Had it been shown that Canbaz' statement was not voluntary, the inference would then be that the court would have sustained a motion to suppress. Canbaz then concludes that "[h]ad Canbaz' statement been suppressed, there would have been no 'story', no background, for the jury." *Id.* at 9. Combining the assumption that the statement would be suppressed with the assumption that the gun and other items found from the search of Canbaz' vehicle would also be suppressed, Canbaz concludes:

> The only evidence would have been that Canbaz and Peralta were dating, she had a protection Order against·him, and a man shot her and left in a red Jeep. Canbaz' statement clarifies all of the details, and since Canbaz did not testify, none of those details could be rebutted.

*Id.* at 9-10.

It is the criminal defendant's burden to demonstrate that he or she was prejudiced by the alleged deficiencies of counsel. *State v. Ray*, 266 Neb. 659, 668 N.W.2d 52 (2003). The argument that an investigation "may have" concluded that Canbaz lacked sufficient powers of reason and volition to voluntarily make a confession, and that therefore, his confession "may have" been

excluded upon proper objection, is unsustainable where Canbaz was given an opportunity to prove prejudice in his postconviction hearing and he failed to do so. Canbaz' burden was to show that an investigation *would* have concluded that Canbaz lacked sufficient powers of reason and volition to voluntarily make a confession. Only then could it be said that a motion to suppress the confession would have been sustained, and only then would we consider whether under the remaining evidence, the fact finder would have had a reasonable doubt concerning Canbaz' guilt of first degree murder. Canbaz presented no evidence in this regard. He did not bring forth a mental health expert at all. Instead, the only evidence relevant to Canbaz' voluntariness was set forth in the trial record, consisting of the testimony of Gutnik and Moore, and of the arresting officer at the voluntariness hearing. This evidence does not support a finding that Canbaz lacked sufficient powers of reason and volition to voluntarily make a confession.

It seems that Canbaz may believe that he is entitled to a presumption of both deficient performance and prejudice as to the failure to investigate the voluntariness of his confession. Canbaz sets forth our statement in *State v. Nielsen*, 243 Neb. 202, 224, 498 N.W.2d 527, 543 (1993), as follows:

> The failure of counsel to investigate or move to suppress a questionable confession is not per se ineffective assistance of counsel if it can be shown from the record that the evidence is so overwhelming against the defendant that failure to investigate or suppress the confession was a reasonable strategic move by counsel or that the defendant suffered no prejudice from counsel's inaction.

Canbaz relies heavily on the assertion that the evidence was not "overwhelming" against him. Canbaz apparently assumes that his statement was "questionable" and that therefore, so long as the evidence is not "overwhelming" against him, trial counsel's alleged failure to investigate the voluntariness of the confession was per se ineffective assistance of counsel.

The proposition quoted in *Nielsen* was derived from *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992), which presented an appeal from the district court's refusal to grant an evidentiary hearing on a motion for postconviction relief. The statement quoted is not found in the body of the opinion, but, rather,

in a syllabus point. In the opinion itself, we instead state: "There is . . . *no* per se rule mandating investigation or suppression of questionable confessions." (Emphasis supplied.) *Id.* at 916, 492 N.W.2d at 20. We thus noted that it was "debatable whether the deficiency requirement . . . is even met." *Id.* Nevertheless, we decided the case on the ground that even if the defendant could have shown that his counsel's representation was deficient, the defendant had failed to tell us why the results would have been different. The evidence against him was "overwhelming" regardless of the confession. *Id.* at 917, 492 N.W.2d at 21.

In *State v. Nielsen, supra*, we addressed a contention that the postconviction hearing judge erred in finding that statements made to law enforcement officials while in jail were voluntary. We concluded that even if we assumed that the statements constituted a confession, and further assumed they were inadmissible, any error in receiving the statements was harmless beyond a reasonable doubt because other evidence produced by the State overwhelmingly established Nielsen's guilt.

The two prongs of the ineffective assistance of counsel test, deficient performance and prejudice, may be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to law of sufficient prejudice, that course should be followed. *State v. Nesbitt*, 264 Neb. 612, 650 N.W.2d 766 (2002). In *State v. Nielsen, supra*, and *State v. Lyman, supra*, we simply disposed of the ineffective assistance of counsel claims by addressing the prejudice prong of the ineffective assistance of counsel test first. To the extent that any statement made in those cases could be construed as removing the defendant's burden to prove in a postconviction hearing both deficiency and prejudice, such language is expressly disapproved.

The postconviction court found that Canbaz' statement was made voluntarily. The record supports that conclusion, and it is not clearly erroneous. Because Canbaz failed to prove at the postconviction hearing that his statement was involuntary, a claim of ineffective assistance of counsel cannot be predicated on trial counsel's failure to object to the admission of that statement.

### ITEMS FROM SEARCH OF VEHICLE

Canbaz next asserts that ineffective assistance resulted from trial counsel's failure to object to the introduction of items found

in Canbaz' vehicle, including the gun, gun case, handcuffs, duct tape, and ammunition. Canbaz states that "[a]ny consent given by Canbaz was the result of a forced entry into his hotel room, and in-custody questioning designed to elicit incriminating statements or evidence, specifically a consent to search his car." Brief for appellant at 9. Canbaz does not elaborate further as to how the evidence procured from the search of his vehicle was inadmissible.

The right to be free from an unreasonable search and seizure, as guaranteed by the 4th and 14th Amendments to the U.S. Constitution and by article I, § 7, of the Nebraska Constitution, may be waived by the consent of the citizen. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003). To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice and not the product of a will overborne. Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *Id.*

A police officer who was involved in the arrest of Canbaz and the search of his hotel room and vehicle testified that he and fellow officers entered Canbaz' hotel room pursuant to a warrant for Canbaz' arrest. He testified that Canbaz was very cooperative and that he gave consent to the search of his vehicle.

The postconviction court found that Canbaz had voluntarily given consent to the search of his vehicle, and again, such finding was not clearly erroneous. As such, trial counsel's failure to object to the admission of the evidence procured from the search of Canbaz' vehicle cannot be the basis for an ineffective assistance claim.

### ADVANCING IMPROPER DEFENSE

Canbaz next asserts that trial counsel was ineffective by repeatedly making reference to the theory of "irresistible impulse," which is a defense not recognized in Nebraska. See *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984). Canbaz claims that each reference in trial counsel's closing argument to impulsive behavior was objected to by the prosecution. Canbaz asserts that rather than asking Gutnik questions about whether Canbaz acted impulsively, trial counsel should have asked Gutnik

whether Canbaz suffered from diminished mental capacity when Peralta was shot. Citing *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999), Canbaz states that diminished mental capacity is a defense recognized in Nebraska and that it "would have been fodder for a closing argument consistent with the medical diagnosis of defendant's expert." Brief for appellant at 14. Canbaz concludes: "The continued use of the impulsive theory shows that counsel was not familiar with the state of Nebraska law at the time of the trial." *Id.*

In a hearing during trial on the prosecution's motion in limine regarding Gutnik's testimony, trial counsel explained that he did not seek to expound a sudden impulse defense. Trial counsel's theory was that when Peralta ran, Canbaz reacted impulsively, and not out of premeditation. This, trial counsel explained, was wholly distinct from an "irresistible impulse." The trial court ruled that it would allow testimony as to the issue of impulsive behavior being a part of Canbaz' mental condition generally, but would not allow Gutnik to testify as to Canbaz' mental state specifically at the time of the shooting.

Gutnik accordingly later testified, without objection, that people like Canbaz with a major depressive disorder can have trouble with memory and with thinking clearly at times and that this condition leads to impulsivity. He further testified that he would expect a person suffering from that condition to have his or her judgment "impaired." Gutnik elaborated that a person suffering from a condition such as Canbaz' would have his judgment "clouded," as if looking "through a fog or a cloud and you can't quite see all the information around you, and what you do see is distorted. So you are making judgment calls based on partial information and distorted information."

During closing arguments, trial counsel explicitly stated that Canbaz was not denying responsibility for killing Peralta or claiming to have been insane at the time of the killing. Trial counsel argued that Canbaz was suffering from a major psychotic depression that impaired his ability to think clearly and clouded his reasoning. This, trial counsel argued, was relevant to deciding whether Canbaz acted with premeditation as opposed to acting as the result of a "sudden quarrel."

■ The postconviction court concluded that trial counsel did not set forth an "irresistible impulse" defense, and the evidence supports that conclusion. The doctrine of "irresistible impulse" is a theory of moral insanity that is not recognized by this state. See *State v. Jacobs*, 190 Neb. 4, 205 N.W.2d 662 (1973). Trial counsel made it clear that he was not trying to argue that Canbaz acted without intent, but, rather, that the level of such intent did not rise to first degree or second degree murder. In *State v. Vosler*, 216 Neb. 461, 468, 345 N.W.2d 806, 811 (1984), we explained that "there are a variety of mental conditions which bear upon the ability to form a specific intent. A specific intent, in turn, bears at least upon the degree of criminality which may be assessed and may determine whether any criminality exists at all."

■ When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004). As the above illustrates, trial counsel did in fact argue diminished mental capacity insofar as that related to premeditation and sudden quarrel. We need not decide whether every characterization of the law by trial counsel was legally correct so long as Canbaz was not prejudiced as a result. Certainly, it was an abundantly reasonable tactical decision not to go further and, as Canbaz suggests, argue that prescription antidepressants and drinking alcohol the night before the killing, combined with his depressive disorder and the stress of the situation, made him incapable of forming the requisite intent. Canbaz has failed to prove that trial counsel was ineffective in its defensive strategy.

ADMISSION OF INTENT IN CLOSING ARGUMENT

Canbaz, during oral argument for this appeal, asserted that trial counsel was also ineffective in admitting to the jury during closing argument that Canbaz acted intentionally in shooting Peralta. Specifically, trial counsel stated to the jury the following:

Now, [the prosecutor] talked to you about intent, intentional. There is no requirement in manslaughter that it be unintentional. If it's upon a sudden quarrel, it can still be an intentional act. I think it was an intentional act. It doesn't matter. Manslaughter can be an intentional act as long as it's

upon a sudden quarrel, and that's actually what happened in this case.

This statement was made after much argument as to Canbaz' "clouded" judgment, along with his propensity to act impulsively under the "major psychotic depression" he suffered from, and the extensive argument as to how Canbaz lacked any "plan" to kill Peralta. Trial counsel told the jury that manslaughter can be an intentional act and that Canbaz' action was an "intentional act" in an attempt to get a conviction for manslaughter, despite the expert testimony that Canbaz was capable of forming an intent of action and that he was not insane at the time of the killing.

However, we need not decide whether trial counsel was deficient in making the statement that the shooting was "an intentional act" or whether any such deficiency was prejudicial, because Canbaz failed to raise this argument in his brief on appeal. To be considered by an appellate court, an error must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998). See, also, *Myers v. Nebraska Equal Opp. Comm.*, 255 Neb. 156, 582 N.W.2d 362 (1998); *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000); *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997); *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993), *postconviction relief granted*, 249 Neb. 381, 543 N.W.2d 725 (1996), *overruled on other grounds, State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). We thus will not address this issue further.

### FAILURE TO OBJECT IN REBUTTAL ARGUMENT

Lastly, Canbaz asserts that trial counsel was ineffective in failing to object to prosecution's statements during rebuttal closing argument that a "sudden quarrel" or manslaughter is "people punching each other, hitting each other, getting in a fight and somebody dies." The jury in Canbaz' trial was instructed under a step instruction for first degree murder. We have stated that a defendant convicted of first degree murder could not have been prejudiced by error in the instructions on second degree murder and manslaughter because under a step instruction, the

jury would not have reached the issues of second degree murder and manslaughter. *State v. Benzel*, 269 Neb. 1, 689 N.W.2d 852 (2004). See, also, *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003) (where jury was adequately instructed on element of intent with respect to second degree murder, any alleged failure to further define term "sudden quarrel" at earlier stage of step instruction would not constitute plain error). It likewise follows that a misstatement of an element of manslaughter during closing arguments could not have prejudiced the defendant where the jury, under a step instruction, convicted the defendant of first degree murder and therefore would not have reached the issues of second degree murder and manslaughter. The jury, having found Canbaz guilty of first degree murder, would never have considered whether the shooting arose out of a "sudden quarrel." Accordingly, the failure to object to any alleged misstatement as to the meaning of "sudden quarrel" cannot form the basis for an ineffective assistance of counsel claim.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order denying postconviction relief.

AFFIRMED.