IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. TERRY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JACOBI TERRY, APPELLANT.

Filed September 1, 2020.    Nos. A-20-343, A-20-344.

Appeals from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Ann O. Hayden, and Lauren A. Walag for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

MOORE, Chief Judge, and RIEDMANN and ARTERBURN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

The district court for Douglas County denied Jacobi Terry's motions to transfer two cases to juvenile court. Terry's sole assigned error is that the court erred in finding that the State established a sound basis for retaining Terry's cases in the district court. Finding no abuse of discretion, we affirm.

## BACKGROUND

On October 2, 2019, Terry, age 17 years and 2 months, was with two 16-year-old juveniles, Marshaun Box and Tretavious Knox. Terry was familiar with the victim, Bahy Altairi, who was working as a clerk at Tobacco and Vape on 32d and L Streets in Omaha. Terry knew Altairi had a weapon (a Glock) at the store and plotted with Box and Knox to steal it. At approximately 6:30

- 1 -

p.m., Terry and Knox went to the Tobacco and Vape store, walked around, and purchased some items. A video surveillance camera shows Terry being friendly with Altairi, talking with him, and shaking his hand.

Approximately an hour later, the video shows Terry enter the store with a long gun raised in a firing position and aimed at Altairi. Altairi backed up and Terry reached over the counter to steal the Glock. The counter fell over toward Terry. Altairi, unarmed, took a step toward Terry. Terry fired and hit Altairi. Terry then grabbed the Glock and fled. As a result, Altairi died and Terry was charged on November 15, 2019, with first degree murder, premeditated or in the alternative murder during the commission of a robbery, use of a deadly weapon (firearm) to commit a felony, and criminal conspiracy.

Later the same evening of the shooting, Terry, Box, and Knox went to the residence of an individual to purchase items. The exact identity of the items is in conflict and the evidence indicates it could have been either tennis shoes or a gun. Box had set up the meeting. The individual and his sister were in the garage and Box entered the garage and then left to allegedly retrieve money from his car. Terry had exited the car, but remained in the driveway. When the individual refused Terry's request to approach, Terry opened fire toward the garage and house. He did not strike either the individual or his sister, but did strike the sister's fiance in the back, when he walked out of the house. Although the fiance suffered significant injury, he survived. Terry, Box, and Knox then fled the scene.

As a result of the subsequent events, Terry was charged with criminal conspiracy, attempted robbery, two counts of use of a deadly weapon (firearm) to commit a felony, and assault in the first degree.

Terry filed motions to transfer the two cases to juvenile court. The evidence revealed he has no prior involvement with law enforcement or the juvenile court. A truancy referral was made to the juvenile court and referred to diversion on August 8, 2019, but was "nolle prossed" on October 11 after Terry's arrest on the current charges. Terry's school records, however, reveal numerous discipline problems. He had 20 incidents of disruptive behavior during middle school from 2015 to 2016. He was expelled in September 2016 for having a knife at school. He was sent to Parish School but was suspended in December 2016 for making threats and for intimidation. Terry completed 8th grade at a magnet middle school with four behavior reports and loss of computer privileges for googling "hollow point bullets."

Terry had attendance problems in high school, attending only about 50 percent of the time. He earned only 6 credits during his freshman year and the following summer, receiving grades of Cs and Ds. He earned no credit during his sophomore year or the summer session thereafter. During his junior year, up until the time he was arrested in October 2019, he was earning all Fs in his classes.

A neuropsychologist, Dr. Colleen Conoley, evaluated and interviewed Terry. Although she administered tests, she did not question Terry regarding the events of October 22, 2019; rather, she relied upon the police investigation reports for information. She diagnosed Terry with social pragmatic communication disorder, (SPCD), generalized anxiety disorder, academic or educational problems, and recommended further evaluation for substance abuse. She explained that SPCD has social failing characteristics similar to those seen in autism or Asperger's, but is

not technically either of those. Essentially, a person with SPCD has communication deficits and is unable to read other people to determine their feelings. In addition, Terry suffers from paranoia, social anxiety, and anxiety.

Conoley testified that Terry self-reported he first tried marijuana at age 11, but did not continue at that time because his experience was not "all that spectacular." He tried it again at age 13 but did not become a regular user until a couple of years later. He then added ecstasy, alcohol, and Percocet. On the night of the incident, he tried K2 for the first time.

Conoley recommended a multisystemic intervention including psychiatric re-evaluation to determine if Terry's anxiety medication was helpful and psychotherapy to target his anxiety. She believed his anxiety issues could be addressed within 22 weeks. Terry also needs a new educational plan. His SPCD needs to be treated by a speech language pathologist so he can better learn to deal with his disorder. Any substance abuse should also be dealt with and according to Conoley, should be "relatively brief therapy." She estimated these treatments could be accomplished before Terry turns 19 years of age.

Conoley also stated that Terry is amenable and "will take the shape of whatever environment he is given." That creates a danger in adult prison because the people he sees as successful whose actions he tries to emulate may not be the best example. She cited research that supports an increase in recidivism of juveniles who have been tried as adults, but admitted that it is "not statistically significant."

On cross-examination, Conoley admitted that although she met with Terry after he had been at the youth center for three and a half months and had seen a number of counselors and doctors, she did not consider any of their records prior to evaluating Terry. She conceded that he would have motivation to mislead her. To her knowledge, Terry had never been treated or diagnosed with a mental health or psychiatric disorder prior to October 2019. She admitted that he was a poor informer, yet placed importance on his professed use of being a habitual marijuana and alcohol user, and his claim of having used K2 the night of the events despite the lack of any corroborating evidence.

Conoley also testified about the brain development of adolescents and that Terry had an IQ of 74, which placed him in the very low range of intelligence. She opined that given the combination of brain development and Terry's IQ, he would have less capacity to anticipate outcomes of his actions.

The State called no witnesses but offered 11 exhibits including police reports, a juvenile intake summary, NCIC record, video of the incident at the Tobacco and Vape shop, transcript of the preliminary hearing, and documents reflecting treatments available at the Douglas County Youth Center (DCYC) and Nebraska Correctional Youth Facility (NCYF) which would be available until Terry turned 21 years of age.

After analyzing each factor of Neb. Rev. Stat. § 43-276 (Supp. 2019), in a very thorough and detailed order, the court denied the motion to transfer. It recognized that in light of the charges, Terry could be incarcerated for a period longer than necessary to rehabilitate him, but determined that was an issue for the Legislature. The court stated that "the real issue before the Court is 'whether the length of time the adolescent is under juvenile court jurisdiction' will be sufficient to treat, correct/cure or rehabilitate the juvenile offender to ensure a significant degree of safety to

the community." It stated, based upon the evidence and the facts of the cases, that it was "not confident that treatment, therapy and rehabilitation addressing both the known and unknown issues with [Terry] can be accomplished in a manner protecting public safety by the time [Terry] reaches majority." It concluded that based upon the nature of the charged crimes, the degree of violence involved, the use of a weapon, the wanton dangerousness of the acts, and the age of Terry, it could not conclude with confidence that Terry will not need to be in a secure detention facility or under supervision past his minority. Accordingly, the court found a sound basis for retaining jurisdiction and denied Terry's motion to transfer. Terry timely appealed.

## ASSIGNMENTS OF ERROR

Terry assigns that the district court erred in finding that the State established a sound basis to retain jurisdiction of his cases and thus abused its discretion in denying his motions to transfer.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Terry put him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Cum. Supp. 2018).

In the instant case, when Terry moved to transfer his cases to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276:

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period

extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

Terry argues that the district court's decision was based on an incomplete analysis of the statutory factors and improper reliance on the State's conclusory facts and that it was contrary to the evidence that Terry was amenable to services. We disagree.

Contrary to Terry's argument that the court performed an incomplete analysis of the statutory factors, the order denying transfer contains a 14-page analysis of each factor set forth in § 43-276. Terry contends that the "sum and substance of the State's evidence in support of retention in district court was that the alleged crimes involved violence and that Terry is seventeen years old." Brief for appellant at 8. This statement is controverted by the record.

The State offered the video of the robbery and the police reports for both events. From this evidence, the court could glean Terry's role in both crimes, the violence involved, the motivation and lack of provocation, and the premeditated nature of the events which refuted, in part, Conoley's testimony regarding impulsivity. The State also offered documents reflecting treatments available at the DCYC and NCYF to demonstrate that the type of treatment recommended by Conoley was also available through adult court. It also extensively cross-examined Conoley, pointing out shortcomings in her process and highlighting areas of weakness in her analysis. Therefore, the State's evidence did not relate solely to the violent nature of the crimes and Terry's age.

Terry's argument that the court improperly relied on the State's conclusory facts is also refuted by the court's order. For instance, referencing the State's written closing arguments, the court indicated that the "State argues '[Terry] . . . is not amenable to juvenile court services due to his age. . . .' The State presented no evidence that [Terry] would not be amenable to the treatment suggested by Dr. Conoley." Clearly, the court rejected the State's conclusion that was not

supported by the evidence. In fact, the court concluded "that [Terry] would be amenable to services offered through the juvenile court."

Rather than relying upon conclusory facts by the State, as Terry asserts, the district court's order evinces an analysis by the court of the evidence presented. This is particularly true in the court's analysis of whether the offense included violence and the motivation for the offense. After setting forth Conoley's explanation of teenage impulsivity, the court explained that it "must evaluate how that lack of impulse control manifests. Dr. Conoley's explanation of the reasons for teenagers to impulsively shoot a person do not seem applicable to the circumstances at the . . . residence [that occurred later that night]." Our review of the district court's order does not support a conclusion that the court relied upon conclusory facts by the State in reaching its decision.

Terry relies upon research regarding the development of the adolescent brain to support his argument that his cases should be transferred to juvenile court. The district court recognized the literature, but iterated that a decision on a motion to transfer is governed by the factors contained in § 43-276. Thereafter, it analyzed each of the factors and stated that it could not "conclude that there is sufficient time to ensure that [Terry] will be of little or no risk for violent behavior if transferred to juvenile court." Terry argues that this was in error as the "sole expert unequivocally testified that the opposite was true." Brief for appellant at 14.

A trial court is not obligated to take the opinion of an expert as binding upon it. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993), *disapproved on other grounds, State v. Canbaz*, 270 Neb. 559, 705 N.W.2d 221 (2005). Conoley admitted that if Terry's proposed therapy was ineffective, the type of therapy would need to be re-assessed. And although an educational plan could be developed prior to Terry reaching the age of 19, there was no mechanism short of a guardianship to force him to attend school once the juvenile court's jurisdiction ended. The district court agreed that Terry would be amenable to the type of treatment Conoley suggested; however, it recognized that Terry would have the same neurological immaturity when the juvenile court's jurisdiction ended. Relying upon the two exhibits offered by the State detailing the type of treatment available through adult court, the court recognized that the same issues can be addressed at the DCYC and NCYF until Terry reaches 21 years of age, compelling an additional 2 years in programs. It concluded that additional time would be in Terry's best interests and we find no abuse of discretion in that decision.

The district court was tasked with conducting a balancing test, weighing public protection and societal security against the practical and nonproblematical rehabilitation of Terry. We find no abuse of discretion in the district court's analysis or in its determination that a sound basis existed to retain jurisdiction.

CONCLUSION

The decision whether to transfer a case to juvenile court rests in the discretion of the district court. Our review of the record reveals a thorough review of the factors set forth in § 43-276 and we find no abuse of discretion in the district court's decision. We therefore affirm the district court's order denying Terry's motions to transfer.

AFFIRMED.