IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JAYDIN SMITH, APPELLANT.

Filed November 17, 2020.    No. A-20-520.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Leigh A. Ellis, and Jessica C. West for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, RIEDMANN and ARTERBURN, Judges.

MOORE, Judge.

INTRODUCTION

Jaydin Smith appeals from the order of the district court for Douglas County, denying his motion to transfer his case to juvenile court. Finding no abuse of discretion by the district court, we affirm.

BACKGROUND

An information was filed on May 8, 2020, charging Jaydin with second degree murder, a Class IB felony; use of a deadly weapon (firearm) to commit a felony, a Class IC felony; and possession with intent to distribute marijuana, a Class IIA felony. The charges arose from an incident occurring on March 12, 2020, involving the shooting death of Daheem Conley. The case had previously been filed in county court but was bound over to district court. Jaydin, born in

- 1 -

November 2002, was 17 years old at the time of the occurrence. Jaydin filed a motion to transfer the case from district court to juvenile court and the hearing on the motion was held on July 13. Testimony was received from Kari R. Perez, Ph.D., and several exhibits were received in evidence including the evaluation performed by Perez; the December 2014 deposition of Colleen Conoley, Ph.D., regarding adolescent brain development; articles regarding teen impulsive and antisocial behavior; an affidavit of Melissa Driscoll, juvenile court coordinator with the Douglas County Public Defender's office, regarding services available to Jaydin through the juvenile court; juvenile intake summaries, case record, and intake screening assessment; police reports from 2018 and January 2020; and police reports concerning the incident at issue in this case.

Omaha Police Department reports regarding the incident on March 12, 2020, show that officers were dispatched to a certain address after receiving a "Shotspotter" activation indicating that eight rounds were fired. Upon arriving at the location, officers located shell casings in the street. The officers were then dispatched to the hospital where Conley was undergoing surgery. A bullet that was lodged in his cervical vertebrae was recovered. Conley died of his injuries on March 18.

Prior to the shooting, Demetrius D. was in communication with Conley to set up a meeting for the sale of marijuana. The plan was for Conley to pull up outside the house in question. Conley was a backseat passenger in a vehicle with four other occupants. Upon arrival, Conley texted Demetrius, after which Demetrius and Jaydin went out to the car. Demetrius got in the car, then exited with the marijuana and the car began to drive away. As the car was driving away, Jaydin allegedly fired multiple shots at the vehicle, striking Conley in the back of the neck.

According to a person at the residence where the shots were fired, two men who were at the residence left for a short time, and after hearing shots fired, this individual reported that the two men came back inside and left a book bag in the residence before leaving again. The officers located the bag which contained a semi-automatic firearm. After further investigation, Jaydin was identified as a suspect. Jaydin was located during a traffic stop on March 15, 2020, and was arrested on a felony warrant. When questioned about the March 12 incident, Jaydin initially denied involvement, but he later admitted to shooting at the vehicle, claiming that it was done out of self-defense as a gun was pointed at him and Demetrius. Jaydin also admitted that the firearm was his. Jaydin advised that he carried a firearm at all times since being stabbed by a gang member in February 2019. Jaydin also admitted to being a member of the Lomas gang.

Jaydin admitted to using marijuana on a daily basis until he was stabbed in February 2019. The record shows that Jaydin has also used LSD, Ecstasy, and alcohol.

Jaydin has previously been in two juvenile treatment centers, which according to Perez, were more like residential centers that dealt with behavioral issues as opposed to providing treatment for mental health or substance abuse issues. Jaydin had run away from those placements on various occasions. Most recently, Jaydin had been living with his mother until he began possessing a weapon, after which she would not allow him in her house with a weapon. He then stayed with various people.

The record shows that Jaydin's father was abusive to his mother and that their home life was very stressful. Jaydin's parents separated when he was 7 years old. His father was deported to El Salvador when Jaydin was 10 years old, and he eventually died in a work accident. Jaydin's

mother has been involved with other men and has three additional younger children. The family has moved frequently, living in areas that were not safe. Jaydin was stabbed outside his home in February 2019, after which the family moved to Carter Lake, Iowa.

Jaydin was hospitalized after the stabbing and he was found to have THC and LSD in his system. His injuries required a blood transfusion, and he was hospitalized for several days. Jaydin began carrying a weapon after the stabbing incident. Jaydin reported that he had been treated in the emergency room twice for drug-related incidents.

Jaydin's school history shows that he frequently changed schools. He was placed on medication for ADHD during 4th grade, but eventually discontinued taking the medication. Jaydin had a history of frequently skipping classes and behavioral issues at school, which led to disciplinary action including one suspension. During 10th grade, he was charged with truancy and placed on probation. Between the 8th and 11th grades, he received formal discipline on at least 11 occasions. At the beginning of his 11th grade year, he was transferred to the juvenile detention center in Pottawattamie County, followed by the Douglas County Youth Center in February 2020, and was taking online classes.

Jaydin's mother reported that he had a history of running away from home and of using marijuana, beginning at age 10. She also reported that Jaydin had anger issues. Jaydin underwent a co-occurring evaluation in April 2018, which resulted in his participation in a treatment program. Jaydin had a chemical dependency evaluation in 2019. Jaydin was in intensive outpatient treatment for about 4 months. Jaydin reported drinking to intoxication every other day for the last 6 months before this incident.

Jaydin reportedly was on probation in Iowa in 2017 for driving a vehicle without the owner's consent and leaving the scene. Jaydin had two previous juvenile cases in Douglas County. In JV 18-1409, he was charged with the status offense of truancy. On February 18, 2020, a juvenile petition was filed, charging Jaydin with possession of a controlled substance (methylphenidate), possession of drug paraphernalia, and false information. Jaydin was arraigned on March 26, and a pretrial was set for April 14 but continued to May 26.

A psychological evaluation of Jaydin was completed by Dr. Kari Perez. Perez met with Jaydin four times via Telehealth, interviewed Jaydin's mother, and reviewed records including police reports, school records, juvenile intake summaries, a probation predisposition investigation, and medical records. Perez conducted various psychological tests. Perez diagnosed Jaydin with post-traumatic stress disorder, bipolar II disorder, ADHD combined type, conduct disorder, cannabis abuse moderate, and alcohol abuse severe. These diagnoses made Jaydin more impulsive, quicker to anger, and prone to "mood lability." As part of her evaluation, Perez conducted a Risk, Sophistication and Treatment Inventory (RSTI) in order to address Jaydin's dangerousness, developmental maturity and treatment amenability. Perez assessed Jaydin's overall risk of dangerousness as medium, meaning that he was not more of a risk than other juvenile delinquents. Jaydin also scored in the middle for sophistication and maturity, meaning that he was similar to other juvenile offenders in the juvenile justice system. Finally, Jaydin had a high score in the area of treatment amenability, meaning that he is likely to be successful in desisting from criminal activity before reaching adulthood with treatment intervention.

Perez acknowledged that Jaydin had several risk factors which are of concern for impulsive behavior in an emotionally and socially charged situation. However, she testified that impulsive violence such as in Jaydin's case was less likely to result in additional violent offending than premeditative violence. Perez opined that Jaydin would benefit from accessing services in juvenile court. She recommended that he be in a very structured environment; a facility where he can learn treatment concepts without access to drugs and antisocial peers. She further indicated that Jaydin needs substance abuse treatment, interventions for his mental health needs, and treatment regarding moral development, conflict resolution and interpersonal skills. Perez believed that Jaydin could complete rehabilitative treatment prior to turning 19 years old, but she emphasized the importance of transitional services following prolonged treatment, such as monitoring, continued outpatient treatment, and family involvement.

In denying the motion to transfer, the district court recounted the evidence and analyzed the various statutory factors. The district court concluded that Jaydin required prolonged treatment that would extend beyond the period of time the juvenile court would have jurisdiction and that sufficient reasons existed to deny the motion after balancing public protection and societal security with the nonproblematical rehabilitation of Jaydin.

Jaydin timely appeals.

## ASSIGNMENT OF ERROR

Jaydin assigns that the district court erred in finding that the State established a sound basis to retain Jaydin's case in district court and thus abused its discretion in denying his motion to transfer the case to juvenile court.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the allegations against Jaydin put him within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Cum. Supp. 2018).

In the instant case, when Jaydin moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Supp. 2019):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015). "In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "The burden of proving a sound basis for retention lies with the State." *Id.*

In support of his argument that the district court abused its discretion in denying transfer, Jaydin relies heavily upon the testimony of Perez, who evaluated Jaydin and concluded that the juvenile court could effectively rehabilitate Jaydin before his 19th birthday. Jaydin argues that the State did not call any witnesses to rebut this testimony and relied only upon exhibits to resist the transfer. Jaydin argues that his previous juvenile intakes did not show that he posed a safety risk to himself or the community, and they have not yet resulted in convictions. He also asserts that his prior placements did not provide the type of services that are necessary for his rehabilitation.

The record shows that Jaydin has had a troubled childhood and adolescence, beginning with domestic abuse in the home and the departure of his father, followed by frequent moves and

changes in schools. Jaydin was diagnosed with ADHD and prescribed medication, however he discontinued taking the medication at some point. Jaydin began experiencing truancy problems in middle school, which continued into high school. He has been placed at two residential facilities for behavioral issues. He has had several instances of running away from the facilities and from his mother's home. Jaydin has mental health issues and a history of substance abuse. Jaydin claims that he has not received treatment for his mental health and substance abuse issues. Although Perez testified that she did not think those issues had been addressed at the previous residential facility placements, she admitted that she did not have access to the facility records and was not familiar with the services available to Jaydin at those facilities. There was evidence that he has had some outpatient treatment, after which he continued to drink alcohol on a frequent basis before this occurrence. Jaydin admits to being a member of a gang and to routinely carrying a firearm.

Two months before the instant offense, Jaydin was arrested for possession of a controlled substance, possession of drug paraphernalia, and giving false information to the police. A juvenile petition was filed in February 2020; however, adjudication and disposition had not occurred prior to the instant case being filed.

The occurrence which led to this case was clearly violent and serious in nature. A person died as a result of Jaydin firing his weapon into a vehicle following a marijuana transaction. If convicted of the charges against him, Jaydin could be facing terms of imprisonment of 20 years to life for the second degree murder charge, a mandatory minimum of 5 years to 50 years for the weapons charge, and up to 20 years for the drug charge. Neb. Rev. Stat. § 28-105 (Supp. 2019).

Although Perez testified that Jaydin would benefit from treatment and that rehabilitation was possible by the time he reached the age of majority, that opinion was qualified somewhat by her testimony that prolonged treatment and transitional services thereafter would be needed to ensure his success. We also note that the district court specifically questioned Perez' opinion, finding her testimony that Jaydin had not previously received treatment was suspect given her admission that she had not reviewed the records from the facilities where he had been placed. A trial court is not obligated to take the opinion of an expert as binding upon it. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993), *disapproved on other grounds*, *State v. Canbaz*, 270 Neb. 559, 705 N.W.2d 221 (2005). The district court found that given the nature of the offense, the results from the psychological examination, Jaydin's history of impulsivity, his access to firearms, his behavior and substance abuse, the treatment needed extended beyond the bounds of the juvenile court system. In our review of the entire record, we agree that it is unlikely that rehabilitation could be accomplished in the short time remaining before Jaydin's 19th birthday.

Based on this record, we cannot find that the district court abused its discretion by retaining the case in the district court. The court was tasked with balancing public safety and security against the rehabilitative needs of Jaydin. The court accomplished this task by weighing the relevant statutory factors as it was required to do.

CONCLUSION

The district court did not abuse its discretion in denying Jaydin's motion to transfer his case to juvenile court.

AFFIRMED.